UNITED STATES  DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN WELLS FARGO HOME MORTGAGE
OVERTIME PAY LITIGATION

No. MDL 06-1770 MHP

This Document Relates To:

ALL ACTIONS

**MEMORANDUM & ORDER**
**Re: Plaintiff Mevorah's Motion for**
**Class Certification**

This multidistrict litigation arises from three putative collective actions and one putative

class action against defendant Wells Fargo Home Mortgage ("defendant" or "WFHM") on behalf of

defendant's Home Mortgage Consultants ("HMCs").  Now before the court is plaintiff James

Mevorah's ("Mevorah") motion for class certification pursuant to Federal Rule of Civil Procedure

23 related to California HMCs.  After considering the parties' arguments and submissions and for

the reasons set forth below, the court rules as follows.


BACKGROUND

I.      WFHM's Practices Related to HMCs

HMCs are employees of WFHM who deal in mortgage loans for the purchase of residential

real estate.  Defendant asserts that there are between 1,000 and 1,500 HMCs in California, plus

thousands more nationwide.  Since 2001, there have been approximately 5,000 California HMCs and

approximately 20,000 nationwide.  Blackwell Dec. ¶ 3.  The primary function of an HMC is to

market and sell mortgages, for which they are paid a commission based on their sales.  Since

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

January 2005, HMCs have also been paid a minimum, non-recoverable draw against commissions. During the relevant period, California HMCs were paid an average annual compensation of $149,000, with some HMCs more than $500,000 or $1 million. Cahalan Dec. ¶ 2. Mevorah acknowledges that a "fairly good sized portion of the class exceeded $100,000 in annual commissions," Mot. at 3, but claims that these commissions arose after working "very long hours" in a highly competitive business. There are no reliable time records of the actual hours worked by HMCs during the class period. Mevorah Dec. ¶ 9. WFHM claims that HMCs are entrepreneur-type employees who have a large degree of autonomy in deciding how to shape their individual business practices. Blackwell Dec. ¶ 4.

HMCs may specialize in a particular type of mortgage they sell, with each specialization entailing a distinct set of strategies and activities. Among the specializations identified by WFHM are "prime HMCs," who work with borrowers qualifying for the best interest rates, "sub-prime HMCs," who work with borrowers with impaired credit, "reverse mortgage HMCs," who work primarily with seniors, "renovation HMCs" specializing in mortgages to finance home improvement, "builder HMCs" focusing on particular housing developments, and "emerging market HMCs" who develop relationships with historically underserved communities. Blackwell Dec. ¶¶ 6–9.

In addition to these varied specializations, WFHM identifies a host of factors which, according to WFHM, create wide variations in compensation, total hours worked, and the amount of time that HMCs spend in and out of the office or consulting with clients. First, HMCs' work-style preferences and marketing strategies lead to different approaches and time commitments based on different target customers and referrers. Blackwell Dec. ¶ 10. Second, because WFHM provides training only and does not supervise HMCs, an HMC may set his or her own compensation goal and work as little or as much as desired to attain that goal. Id. ¶¶ 11–12. Third, HMCs allocate work time differently as they gain experience and build skills and client bases. Id. ¶ 13. Fourth, HMCs operate in a variety of geographic locations within California, including densely-populated and sparsely-populated cities, affluent suburbs and rural communities, with demographic and economic variations creating different experiences among HMCs. Id. ¶ 14. Finally, market forces such as

1   fluctuations in interest rates and consumer preferences based on the time of year (with fewer people

2   buying property during the Fall and Winter months) create differences among HMC work.  Id. ¶ 15.

3   　　　　WFHM's assertions regarding the disparate experiences of HMCs are drawn entirely from

4   the Declaration of Brad Blackwell, which Mevorah describes as a "train wreck."  Mevorah's specific

5   complaints regarding Blackwell's deposition are (1) a lack of foundation for much of Blackwell's

6   purported personal knowledge regarding HMC experiences and (2) an inherent contradiction

7   between Blackwell's purported detailed knowledge about HMC activities and his assertion that

8   "HMCs are not supervised or monitored with respect to how they spend their time or where they

9   spend their time."  Blackwell Dec. ¶ 4.  Mevorah cites to no declaration evidence of his own to

10   refute the substance of Blackwell's claims, however.

11

12   II.　　Mevorah's Action

13   　　　　Mevorah began working as a credit manager at Wells Fargo Financial in Sacramento in

14   2000.  Mevorah Dep. at 10:21–11:16.  Mevorah became an HMC in Yuba City in July 2002,

15   specializing in sub-prime loans.  Id. at 29:8–30:16.  Mevorah was promoted to the position of sales

16   manager in June 2004, originating prime loans and supervising three other prime HMCs.  Id. at

17   47:22–48:14, 93:1–6.  Mevorah left this position, and WFHM, in December 2004 because he was

18   unhappy with his new post.  Id. at 60:18–61:6.

19   　　　　Mevorah filed his complaint on February 10, 2005 in the California Superior Court for the

20   County of San Francisco, alleging eight causes of action related to defendant's classification of

21   HMCs as exempt employees: (1) violation of California Bus. & Prof. Code section 17200 ("section

22   17200") for failure to pay overtime as required by the Fair Labor Standards Act ("FLSA"); (2)

23   violation of section 17200 for violation of California Wage Order 4-2001; (3) two causes of action

24   for violation of California Labor Code section1194 for failure to pay overtime; (4) violation of

25   section 17200 for failure to pay overtime; (5) violation of California Labor Code sections 201 and

26   202 for failure to pay overtime upon termination; (6) violation of California Labor Code section

27   226.7 for failure to provide required meal and rest breaks; and (7) declaratory relief.  Defendant

28

UNITED STATES DISTRICT COURT
For the Northern District of California

3

UNITED STATES DISTRICT COURT
For the Northern District of California

1  removed the action to this court on March 22, 2005.  Mevorah's action was subsequently related to

2  the Multidistrict Litigation captioned as In re Wells Fargo Home Mortgage Overtime Pay Litigation,

3  No. MDL 06-1770 MHP.  Mevorah now moves the court to certify a class defined as "All persons

4  who were employed by Wells Fargo Home Mortgage in the State of California as a Home Mortgage

5  Consultant after February 10, 2001."  Mevorah seeks class certification pursuant to Federal Rule of

6  Civil Procedure 23(b)(3).

7

8  LEGAL STANDARD

9        A party seeking to certify a class must satisfy the four prerequisites enumerated in Rule

10  23(a), as well as at least one of the requirements of Rule 23(b).  Under Rule 23(a), the party seeking

11  class certification must establish: (1) that the class is so large that joinder of all members is

12  impracticable (i.e., numerosity); (2) that there are one or more questions of law or fact common to

13  the class (i.e., commonality); (3) that the named parties' claims are typical of the class (i.e.,

14  typicality); and (4) that the class representatives will fairly and adequately protect the interests of

15  other members of the class (i.e., adequacy of representation).  Fed. R. Civ. P. 23(a).  In addition to

16  satisfying these prerequisites, parties seeking class certification must show that the action is

17  maintainable under Rule 23(b)(1), (2) or (3).  See Rule 23(b); Amchem Products, Inc. v. Windsor,

18  521 U.S. 591, 614 (1997).  Rule 23(b)(3) permits class actions for declaratory or injunctive relief

19  where "the court finds that the questions of law or fact common to the members of the class

20  predominate over any questions affecting only individual members, and that a class action is

21  superior to other available methods for the fair and efficient adjudication of the controversy."

22        The party seeking class certification bears the burden of establishing that the requirements of

23  Rules 23(a) and 23(b) have been met.  See Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180,

24  1188 (9th Cir.  2001), amended by 273 F.3d 1266 (9th Cir. 2001); Hanon v. Dataproducts Corp., 976

25  F.2d 497, 508 (9th Cir. 1992).  However, in adjudicating a motion for class certification, the court

26  accepts the allegations in the complaint as true so long as those allegations are sufficiently specific

27  to permit an informed assessment as to whether the requirements of Rule 23 have been satisfied.

28

4

UNITED STATES DISTRICT COURT
For the Northern District of California

See Blackie v. Barrack, 524 F.2d 891, 901 n.17 (9th Cir. 1975).   The merits of the class members'
substantive claims are generally irrelevant to this inquiry.  Eisen v. Carlisle & Jacquelin, 417 U.S.
156, 177–78 (1974); Moore v. Hughes Helicopters, Inc., 708 F.2d 475, 480 (9th Cir. 1983).
However, courts are "at liberty to consider evidence which goes to the requirements of Rule 23 even
though the evidence may also relate to the underlying merits of the case," and a court may only
certify a class after a "rigorous analysis" as to whether the requirements have been satisfied.  Hanon,
976 F.2d at 509 (internal quotations omitted).

DISCUSSION

I.      Rule 23(a) Requirements

        A party seeking class certification must establish that the numerosity, commonality,
typicality and adequacy of representation requirements of Rule 23(a) have been met.  The court
addresses each of these requirements below.

        A.      Numerosity

        Pursuant to Rule 23, the class must be "so numerous that joinder of all members is
impracticable."  Fed. R. Civ. P. 23(a)(1).  Defendant acknowledges that the purported class includes
approximately 5,000 people.  Accordingly, Mevorah has satisfied the numerosity requirement.

        B.      Commonality & Typicality

        To fulfill the commonality prerequisite of Rule 23(a)(2), plaintiff must establish that there
are questions of law or fact common to the class as a whole.  Rule 23(a)(2) does not mandate that
each member of the class be identically situated, but only that there be substantial questions of law
or fact common to all.  See Harris v. Palm Spring Alpine Estates, Inc., 329 F.2d 909, 914 (9th Cir.
1964).  Individual variation among plaintiffs' questions of law and fact does not defeat underlying
legal commonality, because "the existence of shared legal issues with divergent factual predicates is
sufficient" to satisfy Rule 23.  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    Likewise, under Rule 23(a)(3), the claims of the representative plaintiff must be typical of the claims

2    of the class.  To be considered typical for purposes of class certification, the named plaintiff need

3    not have suffered an identical wrong.  See Hanlon, 150 F.3d at 1020.  Rather, the claims of the

4    putative class must be "fairly encompassed by the named plaintiff's claims."  General Tel. Co. of the

5    Southwest v. Falcon, 457 U.S. 147, 156 (1982) (internal quotation omitted).

6         Defendant argues that Mevorah's claim lacks the requisite commonality and typicality due to

7    the assertedly individualized and factual nature of the inquiries regarding the experience of each

8    particular HMC.  Mevorah argues that his claim involves at least some degree of commonality due

9    to the uniform classification of all HMCs as exempt, and that his claim is typical because he

10    performed the same type of work as other HMCs and seeks overtime compensation on behalf of all

11    class members.  Apart from these general assertions, the parties largely conflate the commonality

12    and typicality inquiries with the more exacting predominance inquiry under Rule 23(b)(3).

13    Accordingly, the court will discuss these issues in conjunction with the Rule 23(b)(3) analysis

14    below.

15

16        C.    <u>Adequacy</u>

17         Rule 23(a)(4) dictates that the representative plaintiff must fairly and adequately protect the

18    interests of the class. To satisfy constitutional due process concerns, unnamed class members must

19    be afforded adequate representation before entry of a judgment which binds them.  See Hanlon, 150

20    F.3d at 1020 (citing Hansberry v. Lee, 311 U.S. 32, 42–43 (1940)).  "Adequate representation

21    'depends on the qualifications of counsel for the representatives, an absence of antagonism, a

22    sharing of interests between representatives and absentees, and the unlikelihood that the suit is

23    collusive.'"  Crawford v. Honig, 37 F.3d 485, 487 (9th Cir. 1994) (quoting Brown v. Ticor Title Ins.

24    Co., 982 F.2d 386, 390 (9th Cir. 1992)).

25         Defendant asserts that Mevorah is antagonistic to the unnamed classmembers, and therefore

26    inadequate, for two reasons.  First, defendant claims that representation of current employees by a

27    former employee is "inherently antagonistic."  Relatedly, defendant claims that current California

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    HMCs prefer to maintain the current compensation system, in which HMCs are paid a commission

2    and have complete control over the amount and type of work they perform.

3          Defendant cites three cases for its argument that a former employee is inherently antagonistic

4    to current employees.  In <u>Southern Snack Foods, Inc. v. J & J Snack Foods Corp.</u>, 79 F.R.D. 678,

5    680 (D.N.J. 1978), a putative class action in which the proposed class consisted of current and

6    former franchisees, the court held that a former franchisee was not an adequate representative

7    because "the suit threaten[ed] the existing contractual relationship between defendant and its present

8    franchisees, which may well operate to their benefit."  Additionally, the court held that a conflict

9    existed between former franchisees, whose principal concern was "maximum recovery of money

10   damages, without regard to any adverse impact on the present system," and current franchisees who

11   "depend[ed] on the continued economic viability and public goodwill" of the defendant.  <u>Id.</u>  The

12   court further noted a line of cases holding that "a former franchisee cannot represent a class

13   consisting of both former and present franchisees."  <u>Id.</u>

14         The court in <u>Van Allen v. Circle K Corp.</u>, 58 F.R.D. 562, 564 (C.D. Cal. 1972), reached a

15   similar conclusion, holding that the interests of former independent operators, who would be

16   interested only in the fullest possible financial recovery, were adverse to current operators who

17   wished to keep working with a financially robust defendant with a favorable public image.  Finally,

18   in <u>Matarazzo v. Friendly Ice Cream Corp.</u>, 62 F.R.D. 65, 68 (E.D.N.Y. 1974), the court held that

19   "former store managers do not have the same interests as present store managers in seeking

20   injunctive relief which might upset Friendly's operation to an extent requiring, for economic

21   reasons, termination of the agreement with many store managers."

22         In addition to this categorical objection, defendant asserts that Mevorah's claim is adverse to

23   the interests of current HMCs who prefer the existing commission-based compensation system.

24   Defendant cites declarations from several current HMCs stating that they prefer the current system.

25   <u>See, e.g.</u>, Aulicino Dec. ¶ 6; Behm Dec. ¶ 8; Collins Dec. ¶ 7; Fahning Dec. ¶ 9; Fine Dec. ¶ 8; Love

26   Dec. ¶ 8; Neushul Dec. ¶ 8; Sidhu Dec. ¶ 6; Vo Dec. ¶ 8.  Defendant additionally cites declarations

27   from two former HMCs making similar claims.  Blickle Dec. ¶ 10; Ross Dec. ¶ 3.  Mevorah asks the

28

7

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1  court to disregard or give little weight to these declarations.  In particular, the declarants' statements

2  regarding their disinclination to give up their commission-based compensation system suggest that

3  defendant may have improperly led them to believe that the goal of the instant litigation is to convert

4  HMCs to hourly employees.  The court does not reach the issue of whether defendant has acted

5  appropriately in obtaining and submitting these declarations.  However, the court acknowledges that

6  such litigation-driven documents are inherently suspect, particularly where the declarants are current

7  employees with an interest in maintaining their ongoing employment relationship.  Additionally, it is

8  not at all clear on the current record that a successful class action by Mevorah would wipe away

9  defendant's commission-based compensation system, as opposed to merely altering the system to

10  correct any allegedly unlawful aspects.  Indeed, the court has discretion, considering all of the

11  arguments of the parties regarding the proposed relief, to fashion remedies that are appropriate for

12  the circumstances.

13        Although former employees may be less than ideal candidates to represent the interests of

14  current employees, defendant points to no categorical rule barring such representation.  Furthermore,

15  the concerns raised in the decades-old cases cited by defendant regarding former employee class

16  action plaintiffs are not compelling here.  Defendant has not shown that a successful suit by

17  Mevorah will unduly affect the current employment and compensation arrangements between

18  WFHM and its presently-employed HMCs.  Additionally, given WFHM's large size and prominence

19  within the financial industry, a  monetary award is unlikely to significantly hamper WFHM's ability

20  to continue its business or employ HMCs.  Accordingly, Mevorah meets the adequacy requirement

21  of Rule 23(a).

22

23  II.    Rule 23(b)(3) Requirements

24        Class certification pursuant to Rule 23(b)(3) requires the plaintiff to establish that "the

25  questions of law or fact common to the members of the class predominate over any questions

26  affecting only individual members, and that a class action is superior to other available methods for

27  the fair and efficient adjudication of the controversy."  The court will address each of these two

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    requirements separately.

2

3         A.    Predominance

4         The predominance inquiry "focuses on the relationship between the common and individual

5    issues." Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244

6    F.3d 1152, 1162 (9th Cir. 2001). Consequently, the presence of common issues of fact or law

7    sufficient to satisfy the requirements of Rule 23(a)(2) is not by itself sufficient to show that those

8    common issues predominate. Hanlon, 150 F.3d at 1022. Nonetheless, "[w]hen common questions

9    present a significant aspect of the case and they can be resolved for all members of the class in a

10   single adjudication, there is clear justification for handling the dispute on a representative rather than

11   on an individual basis." Id. (internal quotations omitted); see also Culinary/Bartender Trust Fund,

12   244 F.3d at 1162. To establish predominance of common issues, a party seeking class certification

13   is not required to show that the legal and factual issues raised by the claims of each class member

14   are identical. Rather, the predominance inquiry focuses on whether the proposed class is

15   "sufficiently cohesive to warrant adjudication by representation." Culinary/Bartender Trust Fund,

16   244 F.3d at 1162 (quoting Amchem, 521 U.S. at 623). Among the considerations that are central to

17   this inquiry is "the notion that the adjudication of common issues will help achieve judicial

18   economy." Zinser, 253 F.3d at 1189 (quoting Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234

19   (9th Cir. 1996)).

20        In the context of overtime pay litigation, courts have often found that common issues

21   predominate where an employer treats the putatuve classmembers uniformly with respect to

22   compensation, even where the party opposing class certification presents evidence of individualized

23   variations. For example, in Wang v. Chinese Daily News, 231 F.R.D. 602, 613 (C.D. Cal. 2005), the

24   court held that the defendant "cannot, on the one hand, argue that all [putative classmembers] are

25   exempt from overtime wages and, on the other hand, argue that the Court must inquire into the job

26   duties of each [putative classmember] in order to determine whether that individual is 'exempt.'"

27   Two recent decisions from this district are in accord. In Tierno v. Rite Aid Corp., No. C 05-02520

28

9

THE, 2006 WL 2535056 (N.D. Cal. Aug. 31, 2006) (Henderson, J.), an overtime class action brought by store managers at Rite Aid, the court held that, given the fact that Rite Aid had historically "treated all Store Managers as a homogenous group for the purposes of" the applicable labor laws and "always categorically classified all Store Managers as exempt employees without exception . . . Rite-Aid's [sic] contention that each Store Manager position must now be individually assessed to determine whether the position can be categorized as exempt or non-exempt rings hollow."  Similarly, in Krzesniak v. Cendant Corp., No. C 05-05156 MEJ, 2007 WL 1795703 (N.D. Cal. June 20, 2007) (Jenkins, J.), another manager overtime case, the court held that where a putative class action plaintiff challenges a policy of classifying all employees of a given title as exempt, the defendant cannot then argue that individualized inquiries into the job duties of each employee are necessary to determine whether each employee is exempt.

It is undisputed that Wells Fargo's compensation and exemption policy is uniform among all HMCs.  The court finds based upon all of the evidence in these cases that common questions related to HMC experiences predominate over individual variations.

The parties' arguments regarding predominance focus on the seven possible exemptions identified by defendant that would justify failing to pay overtime compensation to HMCs.  These exemptions are: (1) the California and federal outside sales exemption; (2) the California and federal commissioned sales exemption; (3) the California and federal administrative exemption; and (4) the federal highly paid exemption.  The court will consider the issues associated with each exemption in turn.

### 1.    Outside Sales Exemption

Under federal and California law, employees classified as "outside salespersons" are exempt from overtime requirements.  29 U.S.C. § 213(a)(1).  Under federal law, an "outside salesman" is defined as an employee whose primary duty is "(i) making sales . . ., or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and (2) Who is customarily and regularly engaged away from the employer's place or

UNITED STATES DISTRICT COURT
For the Northern District of California

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   places of business in performing such primary duty." 29 C.F.R. 541.500(a). The United States

2   Department of Labor has stated that the outside sales exemption may apply to "employees of finance

3   companies who obtain and solicit mortgages." Porter Dec., Exh. C. Courts have acknowledged that

4   "where liability to each plaintiff will depend on whether that plaintiff was correctly classified as an

5   'outside salesman,' the Court will be required to make a fact-intensive inquiry into each potential

6   plaintiff's employment situation" and that class certification may therefore be inappropriate.

7   Clausman v. Nortel Networks, Inc., No. IP 02-0400-C-M/S, 2003 WL 21314065, at *4 (S.D. Ill.

8   May 1, 2003).

9       Mevorah does not dispute the factual nature of the federal outside salesperson inquiry, but

10  claims that the exemption does not apply. First, Mevorah claims that the majority of HMCs' time

11  has been spent working in their offices rather than outside the office, a factual assertion with little

12  support that goes to the merits of the dispute rather than its nature. Second, Mevorah claims that

13  WFHM is not entitled to the outside sales exemption because it lacks a retail concept. In light of the

14  fact that the Department of Labor has specifically identified mortgage salespersons as employees

15  who may qualify as outside salespersons, however, Mevorah's additional merits-based argument is

16  unavailing.

17      California law also contains an "outside sales" exemption. Cal. Labor Code § 1171. Under

18  California law, "outside salesperson" is defined as a person "who customarily and regularly works

19  more than half the working time away from the employer's place of business selling tangible or

20  intangible items or obtaining orders or contracts for products, services or use of facilities." Ramirez

21  v. Yosemite Water Co., 20 Cal. 4th 785, 795 (1999) (internal quotations omitted). Unlike the federal

22  exemption, which focuses on the "primary function" of the employee, the California exemption is

23  "purely quantitative," "focusing exclusively on whether the individual works more than half the

24  working time selling or obtaining orders for contracts." Id. at 797 (internal quotations omitted). The

25  California exemption also differs from the federal exemption in that it does not allow for

26  reclassification of non-exempt work which is incidental to sales. Id. However, the inquiry under

27  California law nonetheless "turns on a detailed, fact-specific determination." id. at 790. The

28

11

California Supreme Court described the inquiry as follows:

> A trial court, in determining whether the employee is an outside salesperson, must . . . inquir[e] into the realistic requirements of the job.  In so doing, the court should consider, first and foremost, how the employee actually spends his or her time.  But the trial court should also consider whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job.

Id. at 802.  Clearly, this is an individualized, factual inquiry that weighs against class treatment.

Regarding this California outside sales exemption, Mevorah likewise claims that the exemption does not apply because the HMCs spent the great majority of their time in their offices.  This, again, is an individual factual determination.  Additionally, Mevorah claims that the outside sales exemption does not apply because HMCs were not paid a true commission.  Mevorah offers no support for his proposition that outside salespersons must be paid a statutorily defined commission-based compensation.  Rather, Mevorah cites one case which does not mention the outside sales exemption at all, Keyes Motors, Inc. v. Division of Labor Standards Enforcement, 197 Cal. App. 3d 557, 563 (1987), and an additional case which deals with the topic of commission compensation in the context of the separate "commissioned employee" exemption.  Ramirez, 20 Cal. 4th at 804.  In light of the discussion in Ramirez, the inquiry as to whether the outside sales exemption is available turns entirely on the nature of work activities, not the form of compensation.  Accordingly, Mevorah's arguments related to compensation are irrelevant to the outside sales inquiry.

Mevorah further claims that the California exemption is unavailable where the employee's sales duties include making the product or rendering the service.  Again, this requirement applies to commissioned sales, not to outside sales.  Employees who are involved in rendering the service being sold may nonetheless qualify as outside salespersons so long as they spend the requisite amount of time engaged in sales activities.

Finally, Mevorah claims that WFHM's appraisal deductions vitiate the outside sales exemption.  In Hudgings v. Neiman Marcus Group, Inc., 34 Cal. App. 4th 1109, 1118 (1995), the court held that an employer's deduction of "a pro rata share of previously paid commissions

12

UNITED STATES DISTRICT COURT
For the Northern District of California

1   attributable to unidentified returns" violated a provision of the California Labor Code making it

2   unlawful for employers to "collect or receive from an employee any part of wages theretofore paid

3   by said employer to said employee" (quoting Cal. Lab. Code § 221).  Mevorah apparently argues

4   that the appraisal fee deduction likewise violates section 221, and therefore the outside sales

5   exception is unavailable.  Mevorah's argument in this regard, to the extent that it is explicated at all,

6   is wholly conclusory, and Mevorah has therefore failed to show that the appraisal deduction vitiates

7   the outside sales exemption as a matter of law.

8

9                    2       Commissioned Sales Exemption

10          Federal law provides an exemption for any employee of a "retail or service establishment"

11   where the employee's regular pay rate exceeds one and one half times the minimum wage and "more

12   than half his compensation for a representative period (not less than one month) represents

13   commissions on goods or services."  29 U.S.C. § 207(i).  It is unclear whether WFHM would qualify

14   as a "retail or service establishment" for the purposes of this exemption.  See Barnett v. Wa. Mut.

15   Bank, FA, No. C 03-00753 CRB, 2004 WL 1753400, at *6 (N.D. Cal. Aug. 5, 2004) (Breyer, J.)

16   (holding that credit companies are not "retail or service establishments"); Gatto v. Mortgage

17   Specialists of Ill., Inc., 442 F. Supp. 2d 529, 541–42 (N.D. Ill. 2006) (holding that a mortgage broker

18   fit within the definition); see also Martin v. Refridgeration School, Inc., 968 F.2d 3, 5 (9th Cir.

19   1992) ("The meaning of the term 'retail establishment' is not obvious without further definition, and

20   the statutory definition is of little assistance.").  In any case, the question of whether WFHM is a

21   "retail or service establishment" is common to the entire class and does not defeat class certification.

22          California law provides a similar exemption for any employee "whose earnings exceed one

23   and one-half (1 1/2) times the minimum wage if more than half of that employee's compensation

24   represents commissions," but does not require that the employer be a "retail or service

25   establishment" in order for the exemption to apply.  8 Cal. Code Regs. § 11040(3)(D).  Mevorah

26   argues, this time pertinently, that the commissioned sales exemption does not apply because HMCs

27   are not paid a true commission.  Specifically, Mevorah claims that WFHM's practice of calculating

28

13

UNITED STATES DISTRICT COURT
For the Northern District of California

compensation based on a complex formula rather than a flat percentage of the sales price brings the compensation scheme outside the definition of commission-based compensation.  The California Court of Appeal has held that two requirements must be met in order for a compensation scheme to constitute "commission wages": "First, the employees must be involved principally in selling a product or service, not making the product or rendering the service.  Second, the amount of their compensation must be a percent of the price of the product or service."  Keyes Motors, 197 Cal. App. 3d at 563.  While it appears that HMC compensation is tied, at least in part, to sales revenue, it is not clear whether California law forbids employers from considering additional factors in determining "commission"-based compensation.  For example, in Ramirez, 20 Cal. 4th at 804, the court did not reach the issue of whether a compensation structure consisting of a flat monthly rate plus a percentage of sales constituted a commission based on the second Keyes factor because the first factor had not been met.  To the extent that liability on the part of WFHM depends on the outcome of this legal question, this question is endemic to the class and favors certification.

Mevorah additionally claims that this exemption is inapplicable because the HMCs' duties include rendering the service, i.e. securing the actual mortgage loan.  Ramirez, 20 Cal. 4th at 804; Takacs v. A.G. Edwards & Sons, Inc., 444 F. Supp. 2d 1100, 1119 (S.D. Cal. 2006).  Mevorah has not conclusively established this as a matter of law, and resolution of this question will require individualized factual analyses of the work experiences of the HMCs.

Additionally, Mevorah claims that HMCs were not guaranteed a salary exceeding one and a half times the California minimum wage.  While it is true that HMCs may not have been guaranteed such compensation, the statute requires only that the earnings exceed that amount.  Clearly, a significant number of HMCs received the minimum statutory compensation to qualify as commissioned employees, though ultimate liability determinations will again require individualized inquiries as to the amount of time worked and the amount of compensation received by each individual HMC.

Finally, Mevorah claims that the exemption requires that the employer keep detailed and accurate records of hours worked by exempt sales people, which WFHM has not done.  8 Cal. Code

14

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    Regs. § 11040(7)(A)(3) & (5).  This failing on the part of WFHM favors class treatment.

2         As with the outside sales exemption, a determination of liability pursuant to the

3    commissioned sales exemption will require an individualized inquiry as to the amount and break-

4    down of each class member's compensation, as well as the amount of time worked by each HMC.

5

6              3.       Administrative Exemption

7         Section 213 additionally exempts employees employed in the administrative capacity from

8    overtime requirements.  29 U.S.C. § 213(a).  An administrative employee is defined as any

9    employee "(1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380

10   per week, if employed in American Samoa by employers other than the Federal Government),

11   exclusive of board, lodging or other facilities; (2) Whose primary duty is the performance of office

12   or non-manual work directly related to the management or general business operations of the

13   employer or the employer's customers; and (3) Whose primary duty includes the exercise of

14   discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200.

15   The Department of Labor has stated that employees who service their employer's financial services

16   business by marketing, servicing and promoting financial products, advising customers and

17   recommending products may fall within this exemption.  Porter Dec., Exh. D.  "However, an

18   employee whose primary duty is *selling* financial products does not qualify for the administrative

19   exemption."  29 C.F.R. § 541.203 (emphasis added).  Accordingly, the federal administrative

20   exemption is not available as a matter of law and the exemption is irrelevant to the class certification

21   analysis.

22        California law also provides for an exemption for administrative employees.  Cal. Lab Code

23   § 515(a).  Mevorah asserts that this exemption, too, is inapplicable for four reasons.  First, Mevorah

24   claims that HMCs have not been paid a salary of at least twice California's minimum wage as

25   required by the applicable regulations.  8 Cal. Code Regs. § 11040(1)(A)(2)(g).[1]  As discussed

26   above, however, many HMCs meet the minimum compensation requirement, and a determination as

27   to whether this requirement is met will require individualized inquiries.

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    Second, Mevorah claims that the exemption requires the base salary to be free of any regular

2    deductions, and that WFHM reduced the monthly earnings of HMCs by the cost of appraisals.  In

3    support of this argument, Mevorah cites only a DOL Opinion Letter dated May 4, 1971.  1971

4    DOLWH LEXIS 22.  It remains manifestly unclear how this letter applies to the California state law

5    administrative exception, and this argument does not support the conclusion that the California

6    exemption is unavailable as a matter of law.

7    Third, Mevorah claims that the work performed by HMCs is not administrative in nature

8    under California law, citing Bell v. Farmers Ins. Exch., 87 Cal. App. 4th 805 (2001).  Mevorah

9    provides no pincite to this case, dealing with insurance claims representatives, in support of his

10   assertion that HMCs are categorically excluded from the definition of administrative employees.

11   Likewise, plaintiff cites Bell v. Farmers Ins. Exch., 115 Cal. App. 4th 715 (2004) for the conclusory

12   proposition that the HMCs are "production workers" rather than administrative employees.  These

13   arguments, directed toward the merits of the case, are unconvincing, and to the extent that

14   individualized inquiries as to the job experiences of HMCs is necessary to determine the application

15   of the California administrative exception, class certification is inappropriate.

16

17            4.       Highly Paid Exemption

18   As a final exemption, WFHM claims that the HMCs are exempt under the federal statute

19   exempting highly compensated employees from overtime laws.  Under federal law, "[a]n employee

20   with total annual compensation of at least $100,000 is deemed exempt . . . if the employee

21   customarily and regularly performs any one or more of the exempt duties or responsibilities of an

22   executive, administrative or professional employee identified in subparts B, C or D of this part."  29

23   C.F.R. 541.601.  Defendant claims that many HMCs qualify under this exemption.  Mevorah again

24   claims that this exemption is inapplicable because the salary basis test is not met, as defendant has a

25   policy and practice of reducing the salary by deducting monthly appraisals.  Again, Mevorah cites

26   only the May 4, 1971 DOL Opinion Letter, without any legitimate discussion of how the contents of

27   this letter affect the determination as to whether the highly paid exemption is available in this case.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

5.    Conclusion as to Predominance

Taken together, defendants' declarations have raised serious issues regarding individual variations among HMC job duties and experiences.  However, the common factual and legal issues nonetheless predominate.  Wells Fargo's uniform policies regarding HMCs weigh heavily in favor of class certification.  As numerous courts have recognized, it is manifestly disingenuous for a company to treat a class of employees as a homogenous group for the purposes of internal policies and compensation, and then assert that the same group is too diverse for class treatment in overtime litigation.  This is particularly true in a situation such as this, where the difficulty of proving hours worked and compensation received is exacerbated by defendant's complete failure to maintain pertinent records.  Accordingly, plaintiffs have satisfied their burden and demonstrated that common issues predominate.

B.    Superiority

The final prerequisite for certification of a class under Rule 23(b)(3) requires the plaintiff to show that a class action is superior to other methods available for the adjudication of the parties' dispute. "Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation."  Valentino, 97 F.3d at 1234.  In considering whether a class action is superior, the court must focus on whether the interests of "efficiency and economy" would be advanced by class treatment.  Zinser, 253 F.3d at 1189 (internal quotations omitted).

Mevorah claims that it will be "fairly straightforward" to resolve the merits of the action using class methodology, asserting that many of the exemption issues are susceptible to disposition by summary judgment.  Mevorah acknowledges, however, that the California outside sales exemption issue may not be subject to resolution on summary judgment, but suggests the use of random statistical sampling to resolve any associated factual issues on a class-wide basis.  Mevorah claims that statistical sampling can also be used to ascertain damages.

In response, defendant raises three principle arguments in support of its contention that a

17

1   class action is not superior.  First, defendant claims that case management problems preclude class

2   certification.  Second, defendant asserts that there is a lack of interest among current HMCs.

3   Finally, defendant cites the availability of alternative remedies.

4

5                    1.    Case Management

6          Defendant claims that the myriad factual issues pertaining to each of the HMCs at each of the

7   numerous WFHM locations throughout California would make class action case management

8   impracticable and therefore inferior.  Defendant also disputes Mevorah's contention that statistical

9   analysis will be helpful in resolving individual factual questions, rejecting Mevorah's claim that the

10  court may make assumptions regarding experience and factual circumstances.  Defendant further

11  claims that it would be denied due process if the results of samples of HMCs were extrapolated to

12  the thousands of class members, in light of the individualized analysis required before liability may

13  be determined.  However, in light of the fact that WFHM is able to classify all of its HMCs as

14  exempt with no granularity whatsoever, the court is not convinced that defendant's due process

15  rights would be vitiated if a representative sample were used to determine whether WFHM's

16  classification is lawful.  Furthermore, other management procedures may be devised that will satisfy

17  the objectives of this action and the objections of defendant.  Accordingly, class action treatment is

18  preferable in terms of case management.

19

20                   2.    Lack of Interest

21         Where "it appears that absent class members actually oppose plaintiff's suit and thus have an

22  interest in controlling their own claims," class certification may not be a superior method of

23  resolving claims.  Lanzarone v. Guardsmark Holdings, Inc., No. CV06-1136 RPLAX, 2006 WL

24  4393465, at *5 (C.D. Cal. Sep. 7, 2006).  Defendant has identified at least some class members who

25  prefer the current, non-overtime arrangement between WFHM and HMCs.  See, e.g., Cathcart Dec.

26  ¶ 2; Elford Dec. ¶ 12; Fellner Dec. ¶ 8; Gomez Dec. ¶ 9; Izurieta Dec. ¶ 12; King Dec. ¶ 10; Lynch

27  Dec. ¶ 7; Neushul Dec. ¶ 6; Stevens Dec. ¶ 2; Weiss Dec. ¶ 9.  As discussed above, however, not

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   only is the reliability of these declarations in serious question, Mevorah insists that current HMCs

2   will not lose their commission-based compensation system if WFHM is found to have violated

3   overtime laws.  Defendant has therefore failed to show that a significant lack of interest exists to

4   justify barring class treatment.

5

6                   3.        Alternative Remedies

7           Defendant claims that class members wishing to challenge their exemption status may either

8   file individual lawsuits, or file claims with the California Division of Labor Standards Enforcement

9   ("DLSE"), thereby obviating the need for class treatment.  With respect to DLSE actions, courts

10  have come down on either side of the question of whether DLSE proceedings are an adequate

11  remedy.  Compare Jimenez v. Domino's Pizza, Inc., 238 F.R.D. 241, 253–54 (C.D. Cal. 2006)

12  (stating that a DLSE hearing "can be a quick procedure . . . and does present a viable alternative"

13  despite "disadvantages inherent" in the proceeding); with Wang v. Chinese Daily News, 231 F.R.D.

14  602, 614 (C.D. Cal. 2005) (rejecting the claim that administrative hearings would be superior to

15  class actions).  Defendant also claims that the fear of reprisal from WFHM resulting from bringing

16  these claims is minimized by the fact that HMCs develop a "book of business" that they can easily

17  transport to a new employer.

18          While the existence of alternative remedies is a factor weighing against class certification,

19  the substantial predominance of common issues coupled with case management techniques tip the

20  balance in favor of class treatment.  Plaintiff has therefore shown that a class action is the superior

21  means of resolving this dispute.

22

23  IV.      "Opt-In" Classification

24          In the event that the court grants class certification, defendant asserts that the class should be

25  limited to an FLSA "Opt-In" collective action.  Plaintiff has not sought certification of an FLSA

26  collective action, and plaintiff has met the requirements for a Rule 23 class action.  Accordingly,

27  defendant's request is denied.

28

                                                19

1

2   CONCLUSION

3          For the foregoing reasons, plaintiff's motion for class certification is GRANTED.

4          Within thirty (30) days of the date of this order the parties shall submit a form of class notice

5   and other appropriate papers to facilitate this order.  The Clerk of Court shall set a further Case

6   Management Conference within forty-five (45) days of this order.

7

8          IT IS SO ORDERED

9

10  Dated: October 17, 2007

11                                                _____

12                                                MARILYN HALL PATEL
                                                  United States District Court Judge
13                                                Northern District of California

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20

UNITED STATES DISTRICT COURT
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>ENDNOTES</u>

1.  Mevorah also inexplicably claims that an employee's salary may not ne "reduced by the quantity or quality of their work," citing 8 Cal. Code Regs. § 11040(1)(A)(2)(g).  This requirement does not appear in this specific citation or anywhere else in section 11040.

21