1   Kevin J. McInerney, Esq. (46941)
    kevin@mcinerneylaw.net
2   Kelly McInerney, Esq. (200017)
    kelly@mcinerneylaw.net
3   Charles A. Jones, Esq. (224915)
    caj@mcinerneylaw.net
4   MCINERNEY & JONES
    18124 Wedge Parkway #503
5   Reno, NV 89511
    Telephone:    (775) 849-3811
6   Facsimile:    (775) 849-3866

7   James F. Clapp, Esq. (145814)
    jclapp@sdlaw.com
8   Marita Murphy Lauinger, Esq. (199242)
    mlauinger@sdlaw.com
9   Zachariah P. Dostart, Esq. (255071)
    zdostart@sdlaw.com
10  DOSTART CLAPP GORDON & COVENEY, LLP
    4370 La Jolla Village Drive, Suite 970
11  San Diego, CA 92122
    Telephone:    (858) 623-4200
12  Facsimile:    (858) 623-4299

13  *Attorneys for Plaintiff*

14                    UNITED STATES DISTRICT COURT

15                  NORTHERN DISTRICT OF CALIFORNIA

16  **CAROLINE URSO**,                    CASE NO. 3:06-md-1770 MHP

17          Plaintiff,                    **PLAINTIFF'S NOTICE OF MOTION
                                          AND MOTION FOR SUMMARY
18      v.                                JUDGMENT ON WELLS' EXEMPTION
                                          CLAIMS UNDER THE:**
19  **WELLS FARGO BANK, N.A.,**           **1) FEDERAL AND CALIFORNIA
                                          OUTSIDE SALES EXEMPTIONS;**
20          Defendant.                    **2) FEDERAL AND CALIFORNIA
                                          ADMINISTRATIVE EXEMPTIONS; AND**
21                                        **3) CALIFORNIA COMMISSIONED
                                          SALES EXEMPTION**
22
                                          Date:    October 25, 2010
23                                        Time:    2:00 p.m.
                                          Crtrm:  15
24                                        Honorable Marilyn Hall Patel

25

26

27

28

1  TO DEFENDANT AND ITS COUNSEL OF RECORD:

2      PLEASE TAKE NOTICE that at 2:00 p.m. on October 25, 2010, or as soon thereafter as

3  the matter can be heard in Courtroom 15 of this Court, located at 450 Golden Gate Avenue in San

4  Francisco, California, 94102, Plaintiff Caroline Urso will, and hereby does, move this Court for

5
   summary judgment.
6

7      The Plaintiff seeks this Court to grant summary judgment as to Wells' affirmative defenses

8  of exemption under the federal and California outside sales exemptions, the federal and California

9  administrative exemptions, and the California commissioned sales exemption.

10     This motion is based on this Notice of Motion, the accompanying Memorandum of Points

11 and Authorities in support thereof, the Declaration of Kelly McInerney, including the exhibits

12
   attached thereto, the pleadings and papers on file herein, and upon such other matters as may be
13
   presented to the Court at the time of the hearing.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:06-md-1770 MHP

1

## **TABLE OF CONTENTS**

I.     INTRODUCTION.................................................   1

II.    THE BURDEN ON WELLS AT
       SUMMARY JUDGMENT...........................................   2

III.   IT IS UNDISPUTED THAT PLAINTIFF WORKED
       OVERTIME......................................................   3

IV.    IT IS UNDISPUTED THAT URSO'S "PRIMARY DUTY"
       WAS SALES AND THAT SHE WAS "PRIMARILY
       ENGAGED" IN SALES ...........................................   3

V.     URSO WAS NOT AN OUTSIDE SALESPERSON...............   4

       A. Wells Has Judicially Admitted That It Cannot Prove Plaintiff
          Was An Outside Salesperson....................................   5

       B. Wells' "Places of Business".....................................   8

       C. The "Customer" Is The Borrower Obtaining The Mortgage,
          Not A Builder Or Any Other Referral Source...................  10

       D. The Pharmaceutical Cases Do Not Support Defendant's Case   11

       E. Form 1003....................................................  13

       F. Wells Misconstrues What Constitutes "Outside Sales"..........  14

VI.    THE ADMINISTRATIVE EXEMPTION...........................  15

       A. The Federal Administrative Exemption...........................  15

       B. The Administrative Exemption Under California Law..........  18

VII.   THE "COMBINATION EXEMPTION" DOES NOT APPLY.....  19

       A. Wells Cannot Prove That Urso Satisfied The "Combination
          Exemption" Under Federal Law....................................  19

       B. The Combination Exemption Is Not Applicable In This
          Case Under California Law.........................................  20

iii

VIII.   THE CALIFORNIA COMMISSIONED SALES EXEMPTION... 22

    A.   Wells Commissions Were Not Based On The Product's
       Price.......................................................................... 22

    B.   Illegal Deductions Void The Commission Plans And
       Disqualify The Commissions............................................. 26

    C.   Wells Cannot Meet Other Requirements............................. 28

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Anderson v. Mt. Clemens Pottery Co.*
(1946) 328 U.S. 680................................................................... 3

*Barnett v. Washington Mutual Bank, FA*
2004 WL 1753400 (N.D. Cal. 2004)................................................ 23

*Bureerong v. Uvawas*
922 F.Supp. 1450 (C.D. Cal. 1996)................................................ 2

*Casas v. Conseco Finance Corp.*
2002 WL 507059 (D. Minn. March 31, 2002)...................................... 16, 17

*Chao v. First National Lending Corp.*
(N.D.Ohio 2006) 516 F.Supp.2d 895................................................ 9

*Condren v. Sovereign Chemical Co.*
1998 WL 165148 (6th Cir. 1998)..................................................... 20

*Davis v. J.P. Morgan Chase & Co.*
587 F.3d 529 (2nd Cir. 2009), cert denied 130 S.Ct. 2416....................... 17

*Fontenot v. Upjohn Co.*
(5th Cir. 1986) 780 F.2d 1190........................................................ 3, 8

*Intracomm, Inc. v. Bajaj*
492 F.3d 285 (4th Cir. 2007).......................................................... 20

*Klem v. County of Santa Clara, Calif.*
208 F.3d 1085 (9th Cir. 2000)........................................................ 2, 4, 7, 15

*Martin v. Cooper Electrical Supply Co.*
940 F.2d 896 (3rd Cir. 1991).......................................................... 16

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*
(9th Cir. 2000) 210 F3d 1099................................................................ 2, 8

*In re Novartis Wage and Hour Litigation*
2010 WL 2667337(C.A. 2 (N.Y.)).......................................................... 4, 12, 15

*Pontius v. Delta Financial Corp.*
2007 WL 1496692.................................................................................. 16, 17

*Romero v. Producers Dairy Foods, Inc.*
235 F.R.D. 474 (E.D. Cal. 2006).......................................................... 10, 23

*Traylor v. Pyramid Services, Inc.*
2008 U.S. Dist. Lexis 73494 (C.D. Cal., Sept. 23, 2008)...................... 21

*Wang v. Chinese Daily News*
435 F.Supp.2d 1042 (C.D. Cal. 2006)................................................... 23

*Wong v. HSBC Mortgage Corp.*
2008 WL 753889 (N.D. Cal. 2008)........................................................ 17

*Yacoubian v. Ortho-McNeil Pharmaceutical, Inc.*
2009 WL 3326632 (C.D. Cal. 2009)...................................................... 12

**CALIFORNIA CASES**

*Barnhill v. Robert Saunders & Co.*
(1981) 125 Cal.App.3d 1...................................................................... 28

*Bell v. Farmers Insurance Exchange*
(2001) 87 Cal.App.4th 805.................................................................... 8, 9, 19

*Harris v. Investor's Business Daily, Inc.*
(2006) 138 Cal.App.4th 28, rev. den. June 28, 2006............................ 23, 28

*Hernandez v. Mendoza*
(1998) 199 Cal.App.3d 721................................................................... 3

*Hudgins v. Neiman Marcus Group, Inc.*
(1995) 34 Cal.App.4th 1109.................................................................. 27

*Kerr's Catering Service v. Department of Industrial Relations*
(1962) 57 Cal.2d 319............................................................................ 26, 27

*Keyes Motors, Inc.*
197 Cal.App.3d 557.............................................................................. 22, 23

*Klem v. County of Santa Clara, Calif.*
208 F.3d 1085 (9th Cir. 2000)............................................. 2, 4, 7, 15

*Morillion v. Royal Packing Co.*
(2000) 22 Cal.4th 575........................................................ 9, 21

*Prachasaisoradej v. Ralph's Grocery Company, Inc.*
(2007) 42 Cal.4th 217........................................................ 27

*Quillian v. Lion Oil Company*
(1979) 96 Cal.App.3d 156.................................................... 26, 27

*Ramirez v. Yosemite Water Co.*
(1999) 20 Cal.4th 785......................................................... *passim*

*Rafiqzada (Duran) v. U.S. Bank National Association*
Alameda Superior Court Case No. 2001 035537........................ 21

**FEDERAL STATUTES**

29 C.F.R. §541.5................................................................ 4

29 C.F.R. §541.200............................................................ 16

29 C.F.R. §541.201............................................................ 16

29 C.F.R. §541.202............................................................ 17

29 C.F.R. §541.203............................................................ 18, 20

29 C.F.R. §541.500............................................................ 4

29 C.F.R. §541.502............................................................ 8, 10, 13

29 C.F.R. §541.503............................................................ 15

29 C.F.R. §541.600............................................................ 21

29 C.F.R. §541.602............................................................ 18

29 C.F.R. §541.700............................................................ 1

29 C.F.R. §541.708............................................................ 21, 22

29 U.S.C. §213................................................................. 15

PLAINTIFF'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:06-md-1770 MHP

1

### CALIFORNIA STATUTES

2

8 C.C.R. §§11010-11015.................................................................. 2

3

8 C.C.R. §11040.................................................................... 4, 18, 22, 28

4

California Labor Code §204.1.................................................... 22, 23

5

California Labor Code §1171................................................................ 22

6

California Labor Code §1194.............................................................. 2

7

8

### OTHER REFERENCES

9

10

Federal Civil Procedure Before Trial
Schwarzer, Tashima & Wagstaffe,
(Rutter Group Practice Guide) §§14:128-14:131..................................... 2, 8

11

12

Division of Labor Standards Enforcement  Opinion
Letter dated September 8, 1998......................................................... 9, 10

13

Division of Labor Standards Enforcement  Opinion
Letter dated May 23, 2003.......................................................... 21

14

15

Industrial Wage Commission Order No. 2004-1...................................... *passim*

16

U.S. Department of Labor's Administrator's Interpretation No. 2010-1........... 3, 15, 16, 17

17

U.S. Department of Labor Opinion Letter of May 17, 1999........................ 17

18

U.S. Department of Labor Opinion Letter of January 25, 2007
2007 WL 506574........................................................................ 9

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:06-md-1770 MHP

# I.
## INTRODUCTION

Plaintiff Caroline Urso worked for Defendant Wells Fargo as a Home Mortgage Consultant (HMC) from July 2004 to August 2005 in Wells' builder division. She was paid commissions for selling mortgages to the buyers of condos and houses in builder developments. Plaintiff moves for summary judgment on Defendant's affirmative defenses that Plaintiff was an outside salesperson under both federal and California law, that she was administratively exempt under both federal and California law, and that she was a commissioned salesperson under California law.[1]

Central to the disposition of both the outside sales exemption and the administrative exemption is what Urso's primary duty was (or how she was "primarily engaged" for purposes of California law).[2] Wells has asserted that Urso had two primary duties: selling mortgages and providing financial advice.[3] However, it is impossible for an employee to have more than one primary duty.[4] Moreover, Urso could not be exempt as both an outside sales person and be

---

[1] The California outside sales and commissioned sales provisions are not "exemptions" under the Wage Orders. The former is an exclusion from the Wage Orders and the latter is an exclusion from the coverage of Subsections 3A-3C of the Wage Orders (which include overtime). However, they are often denominated as exemptions. Plaintiff will, for the sake of convenience, sometimes use the term "exemption" in this brief, but the distinction is important because it prevents tacking outside sales and the administrative exemption under California law (see Section VII).

[2] Under federal law, primary duty is defined in 29 C.F.R. §541.700 as "the principal, main, major or most important duty that the employee performs." Under California law, "primarily" is defined quantitatively and means <u>more</u> than 50% of the work time. Wage Order 4-2001 (Exhibit A), Section 2 (Definitions), Subpart N states "Primarily," as used in Section 1 (Applicability), means more than one-half the employee's work time.

[3] Ex B, Deposition of Todd Hauer, (Wells' FRCP 30(b)(6) deponent on Urso's primary duty) 153:3-13; 154:19-23 [HMCs like Urso in 2004 and 2005 had a primary duty of consulting <u>and</u> a primary duty of sales]; Ex. C, Blackwell Depo, 135:12-15 ["sales is a primary function, but so is counseling a borrower to make the right choice."]; Exhibit D, Wells' Supplemental Responses to RFAs Nos. 17-18.

[4] 29 C.F.R. §541.700 says "duty," not "duties." And by definition, the main or most important duty is singular. This determination is even easier under California law because "primarily" means more than 50% of the working hours so it is mathematically impossible to be primarily engaged in two duties, since it would total more than 100%.

1   administratively exempt at the same time because outside sales people are required to be primarily

2   selling whereas the administrative exemption treats sales work as non-exempt.

3   **II.**
    **THE BURDEN ON WELLS AT SUMMARY JUDGMENT**

4

5   An employee is entitled to overtime unless the employer can demonstrate that one or more

6   exemptions apply. Labor Code §1194; 8 C.C.R. §§11010-11015. "California law governing

    wages is remedial in nature and must be liberally construed." *Bureerong v. Uvawas*, 922 F.Supp.
7
    1450, 1469 (C.D. Cal. 1996). "The wage statutes 'are not construed within narrow limits of the
8
    letter of the law, but rather are to be given liberal effect to promote the general object sought to be
9
    accomplished.'" *Id* at 1469-1470. As stated by the California Supreme Court:

10          "past decisions…teach that in light of the remedial nature of the legislative
11          enactments authorizing the regulation of wages, hours and working
            conditions for the protection and benefit of employees, the statutory
12          provisions are to be liberally construed with an eye to promoting such
            protection. [citation omitted] Thus, under California law, exemptions
13          from statutory mandatory overtime provisions are narrowly construed.
            [citations omitted] Moreover, the assertion of an exemption from the
14          overtime laws is considered to be an affirmative defense, and therefore the
15          employer bears the burden of proving the employee's exemption."

16  *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 794-795. Federal law regarding

17  wages is similar. FLSA exemptions are to be "narrowly construed against… employers

18  and are to be withheld except as to persons plainly and unmistakably within their terms

19  and spirit." *Klem v. County of Santa Clara, Calif.*, 208 F.3d 1085, 89 (9th Cir. 2000).

20  Thus it falls to Wells to demonstrate that Caroline Urso was plainly and unmistakably

21  properly classified throughout her employment as exempt. A party like Urso, without the ultimate

22  burden of persuasion at trial, may carry its burden of production at summary judgment either by

23  negating an essential element of the nonmoving party's defense <u>or</u> by showing that the opposing

24  party does not have enough evidence of an essential element of its defense to carry its ultimate

25  burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.* (9th Cir. 2000)

26  210 F3d 1099, 1106; Schwarzer, Tashima & Wagstaffe, <u>Federal Civil Procedure Before Trial</u>

27  (Rutter Group Practice Guide) §§14:128-14:131. To demonstrate the lack of any genuine issue of

28  material fact as to affirmative defenses asserted by the defendant, "plaintiff need not provide any

1  evidence. It may simply point out the absence of evidence from the defendant." *Id.* at §14:140,

2  citing to *Fontenot v. Upjohn Co.* (5th Cir. 1986) 780 F.2d 1190, 1195. See also *Celotex Corp. v.*

3  *Catrett*, (1986) 477 U.S. 317, 323, 325.

## III.
## IT IS UNDISPUTED THAT PLAINTIFF WORKED OVERTIME

Plaintiff estimates that she worked about sixty hours per week while she was an HMC.

6  Ex. E, Declaration of Caroline Urso ¶11. Defendant has repeatedly admitted that it has no

7  knowledge nor any records of the hours Urso worked. Ex. F, Dixon Depo 58:5-7; 67:23-68:8; Ex.

8  B, Hauer Depo 136:20-137:3; 137:16-138:11.[5] The only deponent who offered any knowledge of

9  Urso's hours, Michael Dalzell (her manager for three months) estimates that Urso worked about

10  50 hours per week. Ex. G, Dalzell Depo 46:13-15. See also Ex. H, Bovensiep Dec. ¶6. The

11  precise number of overtime hours Urso worked is immaterial for this summary judgment motion.

12  What is relevant is that it is undisputed that she worked in excess of forty hours and was not paid

13  for that overtime.

## IV.
## IT IS UNDISPUTED THAT URSO'S "PRIMARY DUTY" WAS SALES AND THAT SHE WAS "PRIMARILY ENGAGED" IN SALES

Because Defendant has consistently asserted that Urso was an outside salesperson to this

17  Court and on appeal, Defendant must admit that Urso's primary duty was sales (federal test) and

18  that she was primarily engaged in sales (California test). As noted, an important distinction

19  between federal and California law is that California has a strictly quantitative test (more than

20  50% of the employee's hours).[6] The March 24, 2010 U.S. Department of Labor's Administrator's

21  Interpretation No. 2010-1 states that mortgage loan officers have a primary duty of making sales

22  (Ex. I, pp. 6 ["Indeed, the Administrator is not aware of any court that has found that mortgage

---

24  [5] The U.S. Supreme Court has held that where a company failed to keep records of hours worked,
25  the presentation of evidence by the employees as to their own hours creates a rebuttable
   presumption that employees worked those hours. *Anderson v. Mt. Clemens Pottery Co.*, (1946)
26  328 U.S. 680, 687-88. The similar rule in California is found in *Hernandez v. Mendoza*, (1998)
   199 Cal.App.3d 721, 726-727.

27  [6] *Ramirez, supra*, 20 Cal.4th at 797

1  loan officers – working either inside or outside – have a primary duty other than sales."] and 9).[7]

2  

## V.
## URSO WAS NOT AN OUTSIDE SALESPERSON

3

4  Both the FLSA and California law require an employee to be selling "away from the

5  employer's place of business" in order to be considered an outside salesperson.[8] Wage Order 4-

6  2001, which applies to HMCs like Urso, states, "'Outside salesperson' means any person, 18 years

7  of age or over, who customarily and regularly works more than half the working time away from

8  the employer's place of business selling tangible or intangible items or obtaining orders or

9  contracts for products, services, or use of facilities." (Ex. A, IWC Wage Order 4-2001 (2)(M);

10  codified at 8 C.C.R. §11040(2)(M)). Similarly, the FLSA requires the employee to be customarily

    and regularly engaged away from the employer's place or places of business when making sales.[9]

11  Urso was not an outside salesperson because she was not selling away from the employer's

12  places of business. Rather, the sales work that she did was done at the Temecula branch HMC

13  office, the sales office at the builder site where she was assigned to work, and from her home.

14  These are all the "employer's places of business." See, Section V(B). As such, she was not

15  making sales at the customer's place of business because the customer was the borrower, i.e., the

16  person taking out the loan. See, Section V(C). Rather, the loan application forms (Form 1003s)

17  indicate that 89.5% of the loans for which Urso filled out the Form 1003 were not taken at the

18  customer's home or the customer's place of business. See, Section V(E). Moreover, Wells has

19  judicially admitted that it does not know how many hours Urso worked, where she was

20  _____

21  [7] "The Secretary of Labor's Interpretation of her own regulations is entitled to deference and is
    <u>controlling</u> unless plainly erroneous or inconsistent with the regulation." *Klem v. County of Santa*

22  *Clara, Calif.*, 208 F.3d 1085, 1089 (9th Cir. 2000) [emphasis added]; see also *In re Novartis Wage
    and Hour Litigation*, 611 F.3d 141, 149, 153 (2nd Cir. 2010).

23

24  [8] The first prong of the test, whether the employee's "primary duty" was selling (FLSA) or
    whether the employee is primarily engaged in sales (California) is undisputed.

25  [9] Plaintiff Urso began working for Wells as an HMC in July 2004. At that time, the governing
    regulation was 29 C.F.R. §541.5. This regulation was amended as of August 23, 2004 and is now

26  found at 29 C.F.R. §541.500. Copies of all relevant regulations are set forth in Exhibit J. The
    "new" regulation substituted the primary duty test (which had long been contained in the

27  administrative and executive exemptions) for the 80/20 test but is otherwise the same.

28

1  geographically when she made sales, or the number of hours that Plaintiff worked on outside sales.

2  See, Section V(A). Thus Wells cannot prove that Urso was an outside salesperson.

3      *Ramirez* holds that to determine whether an employee is an outside salesperson, the court

4  should consider, first and foremost, how the employee actually spends his or her time. *Id.* at 802.

5  But the trial court should also consider whether the employee's practice diverges from the

6  employer's realistic expectations, whether there was any concrete expression of employer

7  displeasure over an employee's substandard performance, and whether these expressions were

8  themselves realistic given the actual overall requirements of the job. *Id.* It is undisputed in this

9  case that Plaintiff spent the vast majority of her time working from either the HMC branch office,

   the builder site where she was assigned to work, or her home. All of these locations are the

10  employer's places of business (see Section V(B) below), and thus she did not work more than 50%

11  of her time selling away from the employer's place of business. With respect to the second

12  consideration urged by *Ramirez*, Wells has admitted it had no expectation of how or where HMCs

13  would spend their time (Ex. C, Blackwell Depo, 120:13-16 [There is no requirement by Wells that

14  an HMC spend a set amount of time out of the office] and Ex. F, Dixon Depo, 42:17-22 [same]

15  and 38:11-18 ["Provided they achieve modest minimum loan origination, they can spend ... as

16  little or as much of their time in the office as they choose."] Wells did not provide any

17  instructions or directions to Urso that she had to be regularly and customarily contacting

18  customers away from Wells locations (Ex. F, Dixon Depo 74:18–23). In fact, Blackwell and

19  Dixon admitted that "it's consistent with Wells Fargo policy, if in his or her discretion, an HMC

20  could successfully sell spending 80 to 90 percent of their time in the office." Ex. C, Blackwell

21  Depo, 127:9-18; Ex. F, Dixon Depo, 43:11-20. James Dixon, Well's 30(b)(6) deponent on the

22  issue of any dissatisfaction Wells ever displayed at the way Urso performed her job as an HMC,

23  stated that he was unaware "of any dissatisfaction with Caroline Urso." Ex. F, Dixon Depo, 78:5-

24  9.

25  **A. Wells Has Judicially Admitted That It Cannot Prove Plaintiff Was An Outside
       Salesperson**

26      Wells has admitted, repeatedly, through multiple FRCP 30(b)(6) deponents, that it cannot

27  prove that Urso spent over 50% of her working hours away from the employer's place of business.

28

1   First is the fact that Wells has repeatedly admitted that it does not know how many hours Urso

2   was working. Ex. F, Dixon Depo 58:5-7; 67:23-68:8 [Wells has no information regarding how

3   many hours Urso worked as an HMC]; Ex. B, Hauer Depo 136:20-137:3 [Wells did not know

4   how many hours Plaintiff Urso was working in either 2004 or 2005]; 137:16-138:11 [no

5   documents indicate how many hours Urso was worked]. Dixon confirmed that "since Wells

6   doesn't know how many hours [Urso] was working, Wells doesn't know how she was spending

7   the majority of her time." Ex. F, Dixon Depo. 58:17-21. Likewise, Brad Blackwell testified,

8   "Wells Fargo does not oversee the movements of our home mortgage consultants inside or outside

9   the office. Ex. C, Blackwell Depo, 119:10-15. When James Dixon was asked if this statement of

10  Blackwell's was accurate with respect to Urso, Dixon responded, "Yes." Ex. F, Dixon Depo 41:9-

    18).

11
        Blackwell made numerous other admissions relevant to Wells' inability to prove that

12  Plaintiff was exempt as an outside salesperson:

13      ·HMCs do not sign in and out of their respective office locations (119:22-24);

14
        ·HMCs are not required to give the branch manager an itinerary of where they are going
15          when they are out of the office (119:25 – 120:3);

16      ·Branch managers are not supposed to be kept informed as to an HMC's comings and
            goings during the business day or business week (120:9-12); and
17

18      ·Wells does not manage the comings and goings of their HMCs (127:3-8).

19      James Dixon confirmed that each and every one of these statements made by Blackwell

20  was true with respect to Urso in particular. Ex. F, Dixon Depo, 41:19-43:20. He also confirmed

21  the statement in Blackwell's declaration that "Although WFHM provides some training, HMCs

22  are not supervised or monitored with respect to how they spend their time or where they spend

23  their time" was true with respect to Caroline Urso (37:21-38:10). Further deposition testimony

24  from Dixon is instructive:

25      ·Wells does not know whether the Plaintiff ever traveled away from Wells locations to
            engage prospective borrowers (56:22-57:1);
26
        ·Wells does not have any information about where Urso was physically when she solicited
27          customers (36:18-20);

28
                                                6

1    ·He is unaware of any documents that Wells has which would reflect where Caroline Urso
     was physically (geographically) during her days as an HMC (43:21-25);

2

3    ·Neither manager one-on-ones, commission reports, pipeline reports, bringing back
     business cards from a project, the Relationship Management Tool (RMT), the document
4    prep lists, the 1003 Forms, nor the document entitled "Other Earnings" actually reflect
     where Urso was geographically when she interacted with a customer, solicited a loan, or
5    originated a home loan (51:6-16; 52:2-54:8; 81:8-12; 86:16-23; 87:24-88:7);

6    · Wells does not know the approximate number of hours that Plaintiff worked on outside
     sales solicitations (68:9-11);
7

8    · Wells does not know the approximate number of hours that Plaintiff worked on work
     incidental to outside sales (68:12-16);
9

10   ·Wells does not know the approximate number of hours worked by Urso on inside sales
     (69:1-3); and

11
     · Wells did not provide any instructions or directions to Urso that she had to be regularly
12   and customarily away from Wells locations when contacting customers (74:18-23).[10]

13        These judicial admissions of Blackwell, Dixon, and Hauer are of enormous consequence.

14   Wells has admitted repeatedly, under oath, that, in effect, it can never prove its affirmative

15   defenses because it doesn't know how or where Plaintiff Urso was primarily engaged or how

16   many hours she actually worked.[11]  Plaintiff has thus satisfied her burden of production at

17   summary judgment by showing that Wells does not have enough evidence of an essential element

18

19   _____

20   [10] The deposition of Todd Hauer, another of Wells' 30(b)(6) deponents, also demonstrates that
     Wells cannot possibly prove that Urso was properly classified as an outside salesperson. Hauer
21   testified that Wells did not know how many hours Plaintiff Urso was working in either 2004 or
     2005. (Ex. B, 136:20-137:3). Furthermore, he testified that although he had seen all of the
22   documents pertinent to Urso, none of the documents he reviewed reflected that Caroline Urso was
     spending the majority of her working time engaged in outside sales. (139:19-25).
23

24   [11] Wells may argue that this testimony is consistent with the "nature" of the outside salesperson.
     While it may be true that even today outside salespeople may not be strictly supervised with
25   respect to the specific moments or locations of outside sales solicitations, this does not excuse
     Defendant from having to prove its affirmative defense that Urso was properly classified. FLSA
26   exemptions are to be "**narrowly** construed against... employers and are to be withheld except as
     to persons **plainly and unmistakably** within their **terms** and spirit." *Klem v. County of Santa*
27   *Clara, Calif.*, 208 F.3d 1085, 89 (9th Cir. 2000) [emphasis added].

28

1 | of its defense to carry its ultimate burden of persuasion at trial.[12]

2 | **B. Wells' "Places of Business"**

3 | As stated previously, outside salespeople must be making sales "away from the employer's

4 | place of business." *Ramirez, supra,* 20 Cal.4th at 797. Accordingly, one must consider what

5 | constitutes an "employer's place of business." Urso worked at the Wells HMC branch office in

6 | Temecula, the sales office at a builder site where she was assigned, and from home. Ex. E,

7 | Declaration of Caroline Urso, ¶6, 13.[13] 29 C.F.R. §541.502 gives an expansive definition of "the

8 | employer's place of business:"

9 | **29 C.F.R. §541.502 Away from employer's place of business**
An outside sales employee must be customarily and regularly engaged "away
from the employer's place or places of business." The outside sales employee is

10 | an employee who <u>makes sales at the customer's place of business</u> or, if selling
door-to-door, at the customer's home. Outside sales <u>does not include sales made</u>

11 | <u>by mail, telephone or the Internet</u> unless such contact is used merely as an adjunct
to personal calls. Thus, <u>any fixed site, whether home or office,</u> used by a

12 | salesperson as a headquarters or for telephonic solicitation of sales is considered
one of the employer's places of business, <u>even though the employer is not in any</u>

13 | <u>formal sense the owner or tenant of the property</u>...          [emphasis added][14]

14 |

15 | [12] *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.* (9th Cir. 2000) 210 F3d 1099, 1106;

16 | Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial (Rutter Group Practice
Guide) §§14:128-14:131. To demonstrate the lack of any genuine issue of material fact as to

17 | affirmative defenses asserted by the defendant, "plaintiff need not provide any evidence. It may

18 | simply point out the absence of evidence from the defendant." *Id.* at §14:140, citing to *Fontenot v. Upjohn Co.* (5th Cir. 1986) 780 F.2d 1190, 1195.

19 | [13] Plaintiff Urso states that she was assigned by Wells to the Lakeshore Villas sales office of the

20 | condo conversion in Oceanside, California and spent Saturdays and Sundays and sometimes one
day during the week there (Ex. E, ¶6). See also Ex. K, Urso Depo. 46:18-47:7; 84:4-18.

21 |

22 | [14] To the extent that California law is patterned after federal statutes and regulations, the Court can
look to federal authorities as an aid in their interpretation. *Bell v. Farmers Insurance Exchange,*

23 | (2001) 87 Cal.App.4th 805, 814-815. Note, however, that there are two extremely important
distinctions between federal law and California law with respect to outside salespeople. *Ramirez,*

24 | *supra,* 20 Cal.4th at 797. California law uses a strict quantitative approach for "primarily engaged"
as opposed to the FLSA's qualitative approach to determine primary duty. Second, California law

25 | (unlike federal law) "does not contain any provision that reclassifies intrinsically nonexempt sales

26 | work as exempt based on the fact that it is incidental to sales. The language of the state exemption
only encompasses work directly involved in 'selling … items or obtaining orders or contracts.'"

27 | *Id.* As such, the California Supreme Court recognized that California state law provides **greater**
protection to employees than the federal law. *Ramirez, supra,* 20 Cal.4th at 795, 797-798.

28 |

1       The Wells branch office is obviously "an employer's place of business." Home

2 offices are likewise considered "an employer's place of business." *Chao v. First National*

3 *Lending Corp.* (N.D. Ohio 2006) 516 F.Supp.2d 895, 901 [loan officers were not customarily

4 and regularly engaged away from defendant's place of business because they most of their

5 work was done from the office or from their own homes]. See also the language of the

6 regulation which states "any fixed site, whether **home** or office." If a home office (i.e., an

7 office in an employee's own home) can be considered an "employer's place of business,"

8 then certainly a sales office that Wells ordered its employees to staff is likewise an

9 employer's place of business. Note, the regulation specifically states that any fixed site used

10 as a headquarters is an employer's place of business "even though the employer is not in any

11 formal sense the owner or tenant of the property." This is consistent with how a home office,

which is not owned or controlled by an employer, can still be considered an "employer's

12 place of business." In fact, Plaintiff was required to be at the builder site on weekends and

13 sometimes during the week and used it as her office for following up on sales. Ex. E, Urso

14 Dec. ¶6; Ex. G, Dalzell Depo 34:9-13.

15       California law takes an equally expansive definition of what constitutes an employer's

16 place of business. California's Division of Labor Standards Enforcement (the DLSE) issued an

17 Opinion Letter on September 8, 1998 regarding "the employer's place of business."[15] It states:

18     "The employer's place of business" is not limited, by the IWC definition, to a
principal place of business or an administrative headquarters. In the
19     construction of remedial wage and hour regulations, any exemption is to be
construed narrowly, and is limited to those employees who fall plainly and
20     unmistakably within its terms. [citations omitted].

21     We therefore conclude that temporary trailers and model homes located at a
22     tract housing site, although physically separate from the home builder's or
seller's headquarters office, nonetheless constitute "the employer's place of
23

24 [15] DLSE Opinion Letters, while not controlling upon the courts by reason of their authority, do
25 constitute a body of experience and informed judgment to which courts and litigants may properly
resort for guidance. *Bell, supra,* 87 Cal.App.4th at 815, citing to *Morillion v. Royal Packing Co.*,
26 (2000) 22 Cal.4th 575, 584. See also DOL Opinion Letter of January 25, 2007, 2007 WL 506574,
*4 which held that "the sales offices is the employer's place of business, because it is a fixed site
27 used as a 'headquarters' for making sales." (Ex. AA).

28

9
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:06-md-1770 MHP

1    business" within the meaning of the IWC's definition of "outside
2    salespersons."

3    Even more importantly, the DLSE states, **"Time spent performing any work at the**
4    **employer's place of business, even if it [is] sales work, counts against the exemption."**
5    (Pages 1-2). (Ex. L, DLSE Opinion Letter dated September 8, 1998).

6    **C. The "Customer" Is The Borrower Obtaining The Mortgage, Not A Builder Or Any**
     **Other Referral Source**

7    Outside salespeople are those employees "who make[] sales at the customer's place of
8    business or, if selling door-to-door, at the customer's home." 29 C.F.R. §541.502; see also
9    *Ramirez, supra*, 20 Cal.4th at 795 and *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474,
10   486-487 (E.D. Cal. 2006). Wells has now come up with a post-litigation fabrication of who its
11   "customers" are. Wells has asserted that "customers" are not only the borrowers who take out
12   mortgages, but also the builders, developers, realtors, bankers, attorneys, CPAs, and other HMCs!
13   (Ex. B, Hauer Depo 118:20-23; Ex. M, Wells' Supplemental Responses to Plaintiff's
14   Interrogatories (Set One) No. 10.

15   However, all evidence is that the customer is the borrower, i.e., the individual taking out
16   the mortgage. James Dixon (Wells' FRCP30(b)(6) designate on who were "customers" under the
17   FLSA) ultimately admitted that "customers" refers to borrowers and the term "clients" refers to
18   sources other than "borrowers." (Ex. F, 30:6-11). Specifically, he admitted that builders are
19   viewed by Wells as clients or referral sources and <u>not</u> as customers (Ex. F, 30:18-22; 32:23-25;
20   34:5-8). He finally stated that Wells considers "customers" to be people who are taking out home
21   loans (34:9-12). See also Exhibits N, O, and P. Wells' recent assertion that everybody is a
22   customer is also contrary to the testimony of Brad Blackwell who testified in 2006 as a 30(b)(6)
23   deponent, **"Customers are the ones that actually fund loans with Wells Fargo."** (Ex. C,
     181:21-22).[16]

24

25

─────────────

26   [16] Wells' attempt to make referral sources "customers" in order to qualify for the outside sales
     exemption is also belied by its whole compensation scheme. Brad Blackwell confirmed that
27   HMCs do not get paid unless the "customer" buys a loan or gets a loan and it closes (Ex. C, 167:6-
     14]; Wells Fargo Home Mortgage receives no compensation from builders or realtors (170:14-21);
28   Wells Fargo Home Mortgage sells no loans to builders or realtors (in their capacity as builders or
     (footnote continued)

─────────────

10

1    Wells cannot dispute that Urso did not travel to her "customer's place of business." In

2  fact, Urso states that she "never left the HMC branch office or Lakeshore Villas to try to seek out

3  prospective borrowers," she "rarely went out into the field," and "almost always asked the

4  customer to come to the sales office at the condos or the Temecula office or to just send in what

5  was needed." Ex. E, Urso Dec. ¶¶7, 8. Moreover, Wells has admitted it has does not know:

6  whether the Plaintiff ever traveled away from Wells locations to engage prospective borrowers

7  (Ex. F, Dixon Depo. 56:22-57:1); it does not have any information about where Urso was

8  physically when she solicited customers (36:18-20); and there are no documents which reflect

9  where Caroline Urso was physically (geographically) during the times she was selling home

10  mortgages (43:21-25). The one relevant document that does exist, the Form 1003, supports

11  Plaintiff's position that she was not at the customer's home or place of business when she sold

12  mortgages. See Section V(E) Other than the two, sometimes three, days a week when Urso was

13  assigned to work at the Lakeshore Villas sales office (one of Wells' places of business), she spent

14  the vast majority of time working at the HMC Temecula branch, or, to a lesser extent, her home.

15  She had information regarding interested customers faxed to her from the sales agents at the

16  builder sites when she was not on site and she did the loan processing at the branch office or her

home. Ex. E, Urso Dec. ¶¶6-8, 13.

17    **D. The Pharmaceutical Cases Do Not Support Defendant's Case**

18    Defendant may try to draw some parallel between Urso, as a seller of mortgages, to

19  California pharmaceutical sales representatives (PSR) cases, in which sales reps for

20  pharmaceutical companies "market" drugs to physicians in order to convince physicians to

21  prescribe those drugs to their patients. However, these cases are neither analogous nor

22  authoritative. It is against the law for pharmaceutical representatives to sell directly to patients.

23  This alone distinguishes these cases because Urso actually marketed and sold the mortgages

24  directly to the consumer (i.e., the borrower).

25

26  realtors) (170:22-171:4); HMCs receive no compensation on a loan that doesn't fund (175:3-9);
and Wells Fargo doesn't charge builders or realtors for any services HMCs provide to them
27  (177:1-6). Furthermore, he admitted that what Wells Fargo ultimately wants from builders and
realtors is referrals of "customers" who will close loans (179:21-180:16).
28

1    More importantly, the future of these trial court decisions will be impacted by the recent *In*

2   *re Novartis* opinion (July 2010), which is the only appellate court to issue an opinion on the

3   subject. *In re Novartis*, 611 F.3d 141 (2nd Cir. 2010). It held that the pharmaceutical sales

4   representatives are not exempt as outside salespeople and are not administratively exempt. *Id.* at

5   154-55, 156-157. Although a case from the Second Circuit, *In re Novartis* includes claims under

6   California state law and the court concluded that "the district court's rulings that the Reps fall

7   within the exemptions provided by state law" be vacated. *Id.* at 157. The court in *In re Novartis*

8   resolved the issue of "commitments to buy" specifically:

9        "It [defendant] argues that the Reps "make sales in some sense" because "they
         are responsible for eliciting commitments from the physicians on whom they
10       call to write prescriptions for NPC drugs and that these prescriptions are, in
         essence, orders for NPC drugs to be used by the patients in purchasing the drugs
11       from pharmacies. [citations omitted] Novartis's emphatic reliance on the word
         "commitments," however, does not lead to a conclusion that the Reps make
12       sales, for it ignores the nature of the "commitment" expressly envisioned by the
         Secretary in enacting the regulations: "a commitment to buy." [citation omitted]
13       The type of "commitment" the Reps seek and sometimes receive from
         physicians is not a commitment "to buy" and is not even a binding commitment
14       to prescribe." *Id.* at 154[emphasis in the original]

15    This is important because HMCs like Urso did not obtain "commitments to buy" from

16  referral sources like builders. The builder did not "buy" anything from Wells Fargo. Moreover,

17  HMCs could, and indeed did, market directly to the "end-users," i.e., the customers/borrowers.

18  The fact that Wells had a relationship with a particular builder did not mean that purchasers of

19  homes constructed by that builder could only obtain their mortgages with Wells Fargo. In fact,

20  Wells states that it was not the exclusive lender at either Lakeshore Villas or CNH. Ex. G, Dalzell

21  Depo 36:7-18 and 37:23-38:4. A buyer was always free to obtain a mortgage from any lender he

22  or she chose and Wells has never produced any evidence to the contrary.[17]

23

24  [17] Thus, even analogizing doctors to realtors or builders would fail because the doctor decides
    what to prescribe and the patient is bound. ["However, physicians here, like the physicians in

25  *Medtronic*, directly control which and how much, of any medication is purchased by patients.
    Physicians, not the end-users, select the appropriate medication. In the chain of pharmaceutical

26  sales, the physicians are the decision makers." *Yacoubian v. Ortho-McNeil Pharmaceutical, Inc.*,
    2009 WL 3326632 *5 (C.D. Cal. 2009)]. The same certainly is not true in our case. The home

27  buyer is hardly bound by a recommendation from a broker or builder.

28

**E. Form 1003**

According to Wells' FRCP 30(b)(6) deponent, Brad Blackwell, who is the Vice President and National Sales Manager for the Home & Consumer Lending Division, the "point of sale" occurs when the loan application is taken. Ex. C, 193:24-25["...a loan is sold when the borrower commits to filling out an application and going through the credit and underwriting process."] (*Id.* at 173:16-20). That loan application form is called a Form 1003. A copy of this federally mandated form is attached as Exhibit Q. While the form itself consists of multiple pages, there is only one section that needs to be reviewed. It is at the end and is important because it actually mirrors 29 C.F.R. §541.502, which states that outside sales do "not include sales made by mail, telephone or the Internet unless such contact is used merely as an adjunct to personal calls." On the Form 1003, there are four blocks that the HMC must choose from when signing off on the application. Those four blocks give the HMC a choice to indicate whether the application was taken by face-to-face interview, mail, telephone, or internet. Wells produced a summary of all of Caroline Urso's 1003 forms (Ex. R). Of the eighty-six (86) loans for which Urso filled out the 1003 form, she checked "mail" 65 times, "telephone" 12 times, and left the section blank 9 times. In other words, Caroline Urso checked mail or telephone 89.5% of the time. This is incontrovertible evidence that 89.5% of her loans were not taken at the customer's home or the customer's place of business.[18] Even if a few of the ones left blank were taken "face to face" it does not mean they were necessarily outside loans; they could have been completed in one of her "offices," i.e., in one of the employer's places of business. See Ex. K, Urso Depo. p. 62:12-16; p. 63:1-11 [she typically did not meet with the buyers during the process from prequalifying to the loan being funded; the only time she met with customers was when she was on-site at the

---

[18] Wells Fargo's FRCP 30(b)(6) designate on this issue, James Dixon, stated that he believes the Form 1003s completed by the HMCs have been accurate with respect to this section dealing with how the loan application was taken, for example, in person, by phone, etc. He further confirmed that Wells Fargo trains its HMCs that it is important to complete all parts of the 1003 accurately. (Ex. D, 78:10-79:5.) Michael Dalzell, one of Urso's managers, pointed to the 1003 in his deposition as a means of determining whether the customer and the HMC were physically together ("face to face") at the time of the 1003 completion. (Ex. G, Dalzell Depo. 42:1-16.)

1  development and those were only a few instances].[19]

2  **F. Wells Misconstrues What Constitutes "Outside Sales"**

3  Wells has twisted the concept of outside sales so far from reality that Wells simply

4  considers everything its HMCs do to be "outside sales." For example, James Dixon testified that

5  Wells does not differentiate between outside sales and inside sales. Specifically, he stated,

6  "Everything is an outside sale within our – my world, our division, you know, retail mortgage

7  lending. It's outside sales for us." Ex. F, 55:14-19; see also 69:10-70:16. Likewise, Todd Hauer

8  stated that Wells only utilized the term "inside sales" to refer to "sales being done in the call

9  centers." Ex. B, 127:23-128:2. (Wells has a group of HMCs at two national call centers who are

   classified as non-exempt; all HMCs like Urso who work outside the call centers are known as

10 "distributed HMCs.") Apparently, Wells does not believe <u>any</u> sales by a distributed HMC are

11 inside sales. When Hauer in deposition was recently presented with a "scenario where a

12 prospective borrower calls an HMC in a Wells location, talks to that HMC about a loan, does the

13 loan application over the phone, and let's say mails in all of the necessary supporting documents to

14 the HMC at the HMC's Wells office," Hauer responded that Wells would consider that an outside

15 sale because the customer happened to be outside of the branch! Ex. B, 128:11-129:9.

16 In Wells' perception, all HMC sales are outside sales and no sale made by an HMC has

17 ever been an inside sale, unless that HMC was working in a call center (and classified by Wells as

18 non-exempt).[20]

19 Defendant may argue that Urso is an outside salesperson because of the "promotional

20 work" that she did. Wells' basic argument is that, because Urso marketed outside to referral

21 ───────────────

22 [19] Defendant has previously criticized Plaintiff's reliance on the Form 1003 to demonstrate that
   Plaintiff's sales were inside sales. Although the Form 1003 cannot tell where an HMC spends her
23 day, if the place of commitment is relevant, the 1003 shows in Urso's case that it was not
24 occurring at the <u>customer's</u> place of business or home.

   [20] Ex. B, Hauer Depo 126:17-127:14; Ex. C, Blackwell Depo 128:22-129:11. Interestingly, there
25 is virtually no difference between what a centralized, non-exempt HMC at one of the call centers
   does compared to a distributed HMC like Plaintiff Urso. When asked about the difference, Brad
26 Blackwell stated that the only difference was that the distributed HMC is able to meet with
   customers locally and "can help bring together real estate agents and consumers." Ex. C,
27 Blackwell Depo, p. 83:7-84:22.

28

1  sources such as builders, therefore all her sales were "outside." However, 29 C.F.R. §541.503(a)

2  states, "Promotional work that is actually performed incidental to and in conjunction with an

3  employee's own <u>outside</u> sales or solicitations is exempt."[emphasis added].[21]

## VI.
## THE ADMINISTRATIVE EXEMPTION

### A.    The Federal Administrative Exemption

That federal administrative exemption is set forth at Section 13(a)(1) of the Fair Labor

Standard Act, 29 U.S.C. §213(a)(1). As pointed out earlier, this claim inherently conflicts with

Defendant's outside sales claim. Under the federal outside sales exemption, the primary duty

must be sales. Under the administrative exemption, the primary duty <u>cannot</u> be sales. The DOL

Administrator's Interpretation No. 2010-1 is exactly on point; the subject of that interpretation is

"Application of the Administrative Exemption under Section 13(a)(1) of the Fair Labor Standards

Act, 29 U.S.C. §213(a)(1), to Employees who Perform the Typical Job Duties of a Mortgage Loan

Officer."[22] It concludes that mortgage loan officers who perform the typical duties described

"have a primary duty of making sales for their employers and therefore, do not qualify as bona

---

[21] Hauer testified that it was Wells' position that if HMCs were physically outside of Wells locations contacting referral sources (such as builders and realtors) that this was exempt activity under the outside sales exemption. Ex. B, 123:22-124:14. The problem with this is §541.503 makes promotion work exempt <u>only</u> when done to further the salesperson's own <u>outside</u> sales. A route sales person is an example; if that individual is out on the road selling, promotion work done to further those <u>outside</u> sales is exempt. Promotional work is <u>not</u> exempt if it is done to further an HMC's <u>inside</u> sales, regardless of where that promotional work is performed. First, one must determine if the salesperson is really engaged in outside sales. If not, any promotional work is furthering non-exempt inside sales. Dixon, when asked, "And as far as Wells is concerned, if you're spending time with referral sources like brokers, CPAs, builders, financial planners, that's outside sales. Right?" replied, "Correct." (Ex. F, Dixon Depo. p. 57:25-58:4). But in reality, even time spent outside with referral sources to further inside sales can never translate to either outside sales or exempt promotion work.

[22] "The Secretary of Labor's Interpretation of her own regulations is entitled to deference and is <u>controlling</u> unless plainly erroneous or inconsistent with the regulation." *Klem v. County of Santa Clara, Calif.*, 208 F.3d 1085, 1089 (9th Cir. 2000) [emphasis added]; see also *In re Novartis Wage and Hour Litigation*, 611 F.3d 141, 149, 153 (2nd Cir. 2010). Although this Interpretations applies to inside mortgage loan officers, Plaintiff contends she was an inside loan officer.

1    fide administrative employees." (Ex. I, p. 9)[23]

2    29 C.F.R. §541.200 requires the employee to be compensated on a salary or fee basis at a

3 rate of not less than $455 per week; to have a primary duty of the performance of office or non-

4 manual work directly related to the management or general business operations of the employer or

5 the employer's customers; and whose primary duty includes the exercise of discretion and

6 independent judgment with respect to matters of significance.

7    Wells cannot prove that Urso performed work "directly related to management or general

8 business operations." 29 C.F.R. §541.201 states, in part, that an employee "must perform work

9 directly related to assisting with the running or servicing of the business, as distinguished, for

10 example, from working on a manufacturing production line or selling a product in a retail or

11 service establishment." This sets up the production worker dichotomy.[24] The DOL

12

13 [23] The DOL's Administrator's Interpretation No. 2010-1 negates Wells Fargo's contention that
Plaintiff's primary duty was also providing financial advice. It points out that compiling and
14 analyzing potential customers' financial data is done by loan officers because "doing so is
necessary to evaluate the customers' qualifications for a loan, i.e., to make a sale" citing to *Pontius*
15 *v. Delta Financial Corp.*, 2007 WL 1496692, at *9 and n.20. "They are not analyzing the
information to provide advice to the customer, which the customer could take and use elsewhere.
16 Rather the loan officers are performing '*screening* for the benefit of the employer, rather than
*servicing* for the benefit of the customer." (Ex. I, Administrator's Interpretation No. 2010-1 at p.
17 5).

18

19 [24] *Martin v. Cooper Electrical Supply Co.*, 940 F.2d 896, 905 (3rd Cir. 1991)[inside salespersons
who sold electrical products for their employer did not "service" the business simply because they
20 engaged in negotiations and represented the employer in their sales efforts, because such
negotiations over the price and other terms of the sale "are 'part and parcel' of the activity of
21 'producing sales'." *Id.* at 904. Accordingly, any such duties undertaken "in the course of ordinary
selling do not constitute administrative-type servicing of Cooper's wholesale business ... These
22 activities are only routine aspects of sales *production*." *Id.* at 905.] See also *Casas v. Conseco*
*Finance Corp.*, 2002 WL 507059, at*9 (D. Minn. March 31, 2002) [2,800 loan originators were
23 not administratively exempt because they were production workers since their primary duty was to
24 sell home loans to individual consumers. Specifically, the court stated:
"After careful consideration, the Court concludes that plaintiffs are production rather than
25 administrative employees. Conseco's primary business purpose is to design, create and
sell home lending products. As loan originators making direct contact with customers, it is
26 plaintiffs' primary duty to sell these lending products on a day-to-day basis. As is evident
from a description of plaintiff's job duties, plaintiffs are responsible for soliciting, selling
27 and processing loans as well as identifying, modifying and structuring the loan to fit a
28 (footnote continued)

1   Administrator's Interpretation 2010-1 found loan officers similar to Urso to be production

2   workers. (Ex. I, pp 3-6 ["mortgage loan officers perform the production work of their employers"].

3   Likewise, Urso was not administratively exempt because she was a production worker.

4        Wells cannot prove that Urso exercised discretion and independent judgment since she

5   simply exercised skill, she could not change loan requirements, and the underwriters made the

6   ultimate decisions to approve the loans.  29 C.F.R. §541.202 describes "discretion and

7   independent judgment."[25]

8        Moreover, Urso was not administratively exempt because she sold financial products.

9

10       customer's financial needs.  In the Court's view, these duties establish that plaintiffs are
         primarily involved with "the day-to-day carrying out of the business" rather than the
         "running of [the] business [itself]" or determining its overall course or policies."

11  See also *Wong v. HSBC Mortgage Corp.*, 2008 WL 753889, at *7 (N.D. Cal. 2008) [summary

12  judgment granted  because plaintiff mortgage loan officers were not administratively exempt];
    *Pontius v. Delta Financial Corp.*, 2007 WL 1496692, at *8 [loan officers' primary duty was to

13  generate sales, rather than assisting in the administrative operations]; *Davis v. J.P. Morgan Chase
    & Co.*, 587 F.3d 529, 535 (2nd Cir. 2009), cert denied 130 S.Ct. 2416, [underwriters were found

14  not be administratively exempt because they were production workers]

15  Wells' 30(b)(6) witness Brad Blackwell also supports Plaintiff's contention that HMCs are
    production workers.  Asked the primary product of Wells Fargo Home Mortgage, he answered,

16  "the primary products are a variety of home loans used for the purpose of purchasing or financing
    one- to four-unit residential real estate properties." Ex. C, 169:15-22. When asked what products

17  the HMC can sell, he answered, "The product that they directly sell is – are mortgages." (168:13-
    17). Furthermore, he admitted that if an HMC counsels a customer and that customer's loan

18  doesn't fund, the HMC receives no compensation for that counseling (175:6-9) and that Wells
    doesn't charge customers for counseling (176:23-25).

19
    [25] Section (e) of the regulation states, in relevant part, "The exercise of discretion and independent

20  judgment must be more than the use of skill in applying well-established techniques, procedures or
    specific standards described in manuals or other sources."  Plaintiff Caroline Urso simply

21  exercised skill in filling out required forms and inputting information. The computer told her
    which loans were available to a particular customer. Ex. E, Urso Dec. ¶5. It was the underwriters,

22  not the HMCs, who actually approved the mortgage loans. Ex. G, Dalzell Depo, 72:1-3; Ex. E,
    Urso Dec. ¶¶5, 15. See *Casas v. Conseco Finance Corp.*, 2002 WL 507059, at*9-10 (D. Minn.

23  March 31, 2002) [2,800 loan originators lacked the discretion and independent judgment necessary

24  to qualify for the administrative exemption];  *Pontius v. Delta Financial Corp.*, 2007 WL
    1496692, at *10-11 [mortgage analysts do not exercise independent judgment and discretion to

25  satisfy administrative exemption] and the DOL Opinion Letter of May 17, 1999 which concluded

26  that loan officers of a mortgage brokerage company were not administratively exempt in part
    because their activities required "the use of skill and experience in applying techniques,

27  procedures, or specific standards rather than the exercising of discretion and independent
    judgment, within the meaning of the regulations." (Ex. S, p. 2).

28

17

1  29 C.F.R. §541.203(b) states, in relevant part, **"However, an employee whose primary duty is**

2  **selling financial products does not qualify for the administrative exemption."** [emphasis

3  added]. As such, there is no way for Urso to be administratively exempt under the federal

4  exemption since her primary duty was selling mortgages.

5  Finally, Defendant cannot prove that Urso met the salary basis test.[26]

6  **B.    The Administrative Exemption Under California Law**

7  The test for administratively exempt employees is set forth at Wage Order 4-2001(1)(A)(2)

8  and Section 1(A)(2) of 8 C.C.R. §11040 and is largely similar to the federal requirements, except

9  that California law again uses a quantitative test, requiring the employee to spend over 50% of his

10  or her working hours performing administrative activities and Section (f) states that "the activities

11  constituting exempt work and non-exempt work shall be construed in the same manner as such

12  terms are construed in the following regulations under the Fair Labor Standards Act effective as of

13  the date of this order: 29 C.F.R. Sections 541.201-205, 541.207-208, 541.210, and 541.215." The

14  effective date of this order was January 1, 2001. See Ex. A, Wage Order 4-2001, title page and

15  first page. The significance of this is that California does not use some of the federal regulations

16  that were amended in 2004. A copy of the C.F.R. regulations as of 2001 is attached as Exhibit W,

17  with inapplicable provisions crossed out.[27]

---

18  [26] HMCs were paid "minimum recoverable draws against net commissions" which were subject
19  to numerous deductions. Ex. U, 2004 HMC Compensation Plan, p. 1, Section IV(A) ["deficits
   may result from commission splits, commission draws, overpaid compensation, pricing subsidies
20  or from losses to Wells Fargo Home Mortgage, resulting from uncollected fees, violation of
   company policies or procedures, or for failure to meet loan compliance and quality requirements,
21  price protection, registration and documentation requirements or other performance expectations
   set forth herein."]; Ex. B, Hauer Depo 27:21-28:4, *et seq.* Deductions vitiate "salary." 29 C.F.R.
22  §541.602(a) ["which amount is not subject to reduction because of variations in the quality or
23  quantity of work performed."]

24  [27] Unfortunately for Wells, its FRCP 30(b)(6) deponent on the issue of whether Urso was deemed
   by Wells to be exempt under California law, Todd Hauer, simply stated he did not know. (Ex. B,
25  Hauer Depo, 150:2-17). When asked if there was anything in any of the documents that he
26  reviewed relating to Caroline Urso that indicates that she was providing advice or counseling to
   prospective borrowers about what financial products were available, Hauer responded, "Not to my
27  knowledge." Ex. B, 159:20-25. Likewise, James Dixon, in his deposition, when asked the
   approximate number of hours worked by Urso on identifiable administratively exempt tasks,
28  (footnote continued)

1   As described earlier, Urso was a production worker, and thus not administratively exempt.

2   See *Bell v. Farmers Ins. Exchange* (2001) 87 Cal.App.4[th] 805, 826 [insurance adjusters were

3   production workers because claims adjusting was the sole mission of the branch claims offices

4   where the plaintiffs worked].

5   Similarly, Wells cannot prove that Urso used independent judgment and discretion.

6   Plaintiff Urso simply exercised skill in filling out required forms and inputting information. The

7   computer told her which loans were available to a particular customer. Ex. E, Urso Dec. ¶5. It was

8   the underwriters, not the HMCs, who actually approved the mortgage loans. Ex. G, Dalzell Depo,

9   72:1-3; Ex. E, Urso Dec. ¶¶5, 15. Nor can Wells prove that Urso met the salary basis test under

    California law.

10                                        VII.

11          **THE "COMBINATION EXEMPTION" DOES NOT APPLY**

12   A. **Wells Cannot Prove That Urso Satisfied The "Combination Exemption"**
        **Under Federal Law**
13

14   Wells may claim that the "combination" exemption applies.[28] The combination exemption

15   allows exempt duties under one category to be "tacked" onto exempt duties from another

16   category.[29] According to the Secretary of Labor, "the combination exemption addresses the

17   _____

18   answered that neither he nor Wells knew. (Ex. F, 70:17-23). Wells cannot prove that Urso was
     properly classified as exempt under the California administrative exemption, which requires the
19   employee to be primarily engaged in exempt administrative tasks (meaning over 50% of work
     time) if Wells does not know how many hours were worked by Urso on identifiable
20   administratively exempt tasks.

21   [28] Wells did not plead the combination exemption as an affirmative defense in its Answer (Ex. X,
     Doc.1, Case No. 05-CV-01175 MHP, ¶3), nor did it identify it as one of the federal or California
22   exemptions applying to Urso in its Supplemental Responses To Plaintiff Urso's Interrogatories,
     Nos. 1 and 2 (Ex. M).
23
     [29] Specifically, 29 C.F.R. §541.708 states :
24          "Employees who perform a combination of exempt duties as set forth in the
            regulations in this part for executive, administrative, professional, outside sales and
25          computer employees may qualify for exemption. Thus, for example, an employee
            whose primary duty involves a combination of exempt administrative work and
26          exempt executive work may qualify for exemption. In other words, work that is
            exempt under one section of this part will not defeat the exemption under any other
27          section." [See, Ex. BB for pre and post August 2004 regulations]
28
                                        19
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:06-md-1770 MHP

1   situation when an employee does not meet the primary-duty requirement of any individual

2   exemption." *Intracomm, Inc. v. Bajaj*, 492 F.3d 285, 294 (4ᵗʰ Cir. 2007) [emphasis added]. "In

3   other words, the combination exemption provides a mechanism for cobbling together different

4   exempt duties for purposes of meeting the primary-duty test." *Id.* In the instant case, it has clearly

5   been established that Urso's primary duty was selling mortgages. As a result, this is not a

6   "situation when an employee does not meet the primary-duty requirement of any exemption."

7   Thus, it is not necessary to "cobbl[e] together different exempt duties for purposes of meeting the

8   primary-duty test." Moreover, **selling financial products such as mortgages is specifically non-**

9   **exempt work under the administrative exemption**. 29 CFR §541.203(b). Thus, tacking the

10  administrative exemption onto the outside sales exemption does nothing to advance Defendant's

    case.[30]

11
    "Although the combination exemption permits the blending of exempt duties for purposes
12
    of defining an employee's primary duties, it does not, according to the Secretary, relieve
13
    employers of their burden to independently establish the other requirements of each exemption
14
    whose duties are combined." *Intracomm, supra*, 492 F.3d at 294. The Fourth Circuit agreed with
15
    the Secretary's interpretation. *Id* at 295. As a result, in the instant case, Defendant would have to
16
    prove that Urso 1.) was customarily engaged in sales <u>away</u> from the employer's places of business
17
    (for the outside sales exemption) 2.) had the primary duty of performing office or non-manual
18
    work directly related to the <u>management or general business operations</u> of the employer or the
19
    employer's customers, 3.) exercised discretion and independent judgment with respect to matters
20
    of significance, <u>and</u> 4.) satisfied the salary basis test (the administrative exemption).

21  **B. The Combination Exemption Is Not Applicable In This Case Under**
       **California Law**
22
        Tacking is not available in this case under California law. The only reference that the
23

24  ───────────────
    [30] Plaintiff does not contend that you can never tack the outside sales exemption onto the
25  administrative exemption in order to satisfy the combination exemption under federal law. On the
    contrary, it may be possible, <u>if</u>, as in *Condren v. Sovereign Chemical Co.*, 1998 WL 165148, *4
26  (6ᵗʰ Cir. 1998) (an unpublished decision), the outside sales are of something <u>other than</u> financial
    products [in *Condren*, the plaintiff sold chemicals]. See also *Intracomm, supra*, 492 F.3d at 288
27  [plaintiff sold a software integration system].

28
───────────────

1  combination exemption exists in California is a passing one sentence from a 2003 DLSE Opinion

2  Letter (2003.05.23) (Ex. Y, page 5) which provides zero authority for the assertion and a murky

3  footnote from *Traylor v. Pyramid Services, Inc.*, 2008 U.S. Dist. Lexis 73494, *11 n.3 (C.D. Cal.,

4  Sept. 23, 2008) which simply parrots that same one sentence in the 2003 DLSE Opinion Letter in

5  discussing the tacking of executive and administrative duties.  However, Judge Freedman's

6  decision rejecting tacking of the administrative exemption and outside sales in *Rafiqzada (Duran)*

7  *v. U.S. Bank National Association* (Alameda Superior Court Case No. 2001 035537) is on point

8  due to its reasoning.[31]  Specifically, the court stated:

9         "The federal regulation cited in the DLSE opinion letter is 29 C.F.R. §541.600
       (a section that has been superceded and re-numbered in the current regulations by
10       29 C.F.R. §541.708.)  Defendant has not offered, and the Court has not found, any
       indiciation in the Wage Orders that the federal tacking regulation has been adopted
11       into California law.  Indeed, the current version of the DLSE Enforcement Manual
       contains an appendix showing which federal regulations have been explicitly
12       incorporated into the Wage Orders and which have not.  The Appendix indicates
       that the former 29 C.F.R. §541.600 was not incorporated into the Wage Orders and
13       is not guidance for their enforcement.  (See DLSE Manual (2002 Update), Federal
       Regulations Appendix at 1, 28 [sections in strikeout are not applicable; section 29
14       CFR in strikeout].)
           In the absence of any controlling authority indicating that the federal tacking
15       regulation should be imported, the Court declines to find that the tacking concept
       can be applied to exempt status under California law.  As the California Supreme
16       Court has held, statutory provisions regulating wages that are enacted to protect
       employees are liberally construed with "an eye to promoting such protection," such
17       that exemptions to those protections are to be narrowly construed.  (*Ramirez v.*
       *Yosemite Water Co.* (1999) 20 Cal.4th 785, 794;  *see also Morillion v. Royal*
18       *Packing Co.* (2000) 22 Cal.4th 575, 592 [federal authorities are not applicable
       absence evidence that they were intended to be incorporated into Wage Orders].)
19       Particularly here, where Defendants apparently contend that hours spent on non-
       sales, administrative duties can be added to sales duties (which are per se non-
20       exempt under the administrative exemption) to pass the 50% threshold, the tacking
       concept does not apply to Defendant's affirmative defenses."  (Pages 5-6, filed
21       February 17, 2006)

22
23         Perhaps the most compelling reason that tacking of the administrative exemption and

24  outside sales is not permissible is that in California, the tacking regulation, 29 C.F.R. §541.600

25

26  _____

27  [31] A copy of that decision is attached as Exhibit Z.  This decision is not, of course, binding
    precedent of any kind, but rather is simply cited for its persuasive reasoning.

28

1   (later §541.708), was not adopted in the Wage Orders or 8 C.C.R. §11040. Moreover, 29 C.F.R.

2   §708 allows only the tacking of <u>exemptions</u> and, in California, outside sales and commissioned

3   sales are not exemptions, but rather are exclusions. California Labor Code §1171.[32]

4       Thus, you cannot tack outside sales (not an exemption) onto the administrative exemption

5   to satisy the combination exemption in California.

6   ## VIII.
    ## THE CALIFORNIA COMMISSIONED SALES EXEMPTION

7       Section 3 of Wage Order 4 (8 C.C.R. §11040(3)) relates to hours and days of work.

8   Subsection (A) relates to provisions for overtime but Subsection (D) states: "The provisions of

9   Subsections (A), (B), and (C) above shall not apply to any employee whose earnings exceed one

10  and one half (1 ½) times the minimum wage if more than half of that employee's compensation

11  represents commissions." While rather straightforward on its face, this exemption is not easily

12  met. First, as with any exemption, the burden is on the employer to prove clearly and

13  unmistakably that every element is met. Secondly, in our instant case, the sales aspect of this

14  exemption runs afoul of Wells' persistent claims to both the California and FLSA administrative

15  exemptions. This is so because *Ramirez, supra*, at 804 quoted with approval *Keyes Motors, Inc.*,

16  197 Cal.App.3d 557: "…First, the employees must be involved principally in selling a product or

17  service, not making the product or rendering the service…" Thus Wells must assert and prove that

18  Urso was involved "principally in selling."

19  ## A. <u>Wells Commissions Were Not Based On The Product's Price</u>

20      Labor Code §204.1 defines a commission: "Commission wages are compensation paid to

21  any person for services rendered in the sale of such employer's property or services and based

22  ---

    [32] If an employee spends 40% of time on outside sales and 40% on administrative tasks, s/he

23  qualifies for <u>neither</u> exemption, because s/he cannot reach the quantitative requirement for either
    outside sales or the administrative exemption. To hold otherwise would  permit an employer to

24  claim that an employee engaged in 45% administrative and 6% outside sales to be exempt from
    the wage, hour and working conditions of Labor Code § 1171, *et seq.*, including minimum wage

25  requirements! As noted by *Ramirez*, such is expressly not the intent of the outside sales exclusion
    provided for under §1171 and the Wage Orders. While "tacking" of the executive, administrative

26  and professional exemptions may possibly be permitted in certain circumstances, the "narrowly

27  construed" outside sales exclusion cannot be used to "tack" exemptions as it would lead to absurd
    results.

28  ---

1  proportionately upon the amount or value thereof." This language appears to have been suggested

2  by the lobby for automobile dealers in their successful efforts to modify the requirement that

3  commissions be paid weekly. The legislative history gives no guidance as to the significance of

4  "based proportionately upon the amount or value thereof," but *Keyes* and *Ramirez* interpret it as a

5  percentage of the price. Specifically, *Ramirez*, *supra*, at 804 quotes *Keyes* as holding that a further

6  requirement for the commissioned sales exemption is: "Second, the amount of their compensation

7  must be a percent of the price of the product or service." Later in *Harris v. Investor's Business

8  Daily, Inc.*, (2006) 138 Cal.App.4th 28, 37-38, rev. den. June 28, 2006, the court held that to

9  qualify the commission had to be a percent of the product's price and found that a commission

10  based on "value" and "points" do not qualify. And, in *Wang v. Chinese Daily News*, 435

11  F.Supp.2d 1042, 1062 (C.D. Cal. 2006), the court observed that calculating commissions for sales

12  of advertising based on the number or size of ads sold would not qualify. See also *Romero v.

   Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 487-488 (E.D. Cal. 2006).

13       It is a simple matter for an employer to comply with setting commissions as a percentage

14  of the price, but Wells has failed to do so. The "product" in question is the mortgage loan. (Ex. C,

15  Blackwell Depo. 168:13-17; 169:8-22). The price is the amount of the mortgage loan. (*Barnett v.

16  Washington Mutual Bank, FA*, 2004 WL 1753400 *7 (N.D. Cal. 2004)[33]. If the *Ramirez* definition

17  was utilized by Wells, the commission scheme would be easily read and ascertainable by the

18  worker. Wells Fargo, however, did not utilize an objective formula based upon the price or

19  amount of the mortgage loan; rather, it used a very complicated, tiered commission "rate" that

20  varied on loan types and over a dozen variables including managers' discretion and Wells'

21  subjective and daily changing estimation of a loan's profitability based on its projected resale on

22

23  [33] In *Barnett*, an issue was whether mortgage loan officers were paid a commission that qualified under the Labor Code. In different years, the employer based its commissions on different

24  components of the loan. Judge Breyer directed briefing on those that involved extra compensation for "overage" or for making certain production goals. However, as to the commission when the

25  component was simply the amount of the loan, Judge Breyer had no problem finding that it qualified: "Labor Code Section 204.1, upon which *Keyes* relies, requires the employee to be paid

26  'based proportionately upon the amount or value' of the product the employee sold.

27  Compensation based on the principle amount of the loan is based upon the value of the product sold..."

28

---
23

the secondary (wholesale) market.[34]

The 2004 and 2005 Incentive Compensation Plans for HMCs (which are similar but not identical) are attached as Exhibits U and V. The first thing that might be observed is that while a plan which reflects a commission as a simple percentage of the product sold might reasonably be expected to run no more than two pages, the Wells plan actually runs thirteen (13) pages of small type plus two attachments. Relevant portions relating to the factors entering into the computation of the commission rate are marked with an asterisk. As discussed later, the plan is also illegal and void because of wage deductions, which Wells calls "deficits." These reduce any commission credits and are marked with a "D." The departures from a simple commission based upon the price of the product are too numerous to list given page constraints. Some of the more egregious departures are that the plan creates varying commission rates that are expressed in basis points (1/100th of 1%) (Bates Nos. WFHM1636; 1532, Section IV(A)).[35] Then the "commission rate… is determined by the type of residential mortgage and the monthly funded volume (dollars "$" or units)…" to create a tiered rate. (Bates Nos. WFHM1636; 1532, Section IV(B)).[36] Multiplying the proper tier after including or excluding the various loan types specified then results in a commission "credit" which is "subject to adjustment for Overage and Underage… If the amount of discount and origination fee paid at funding is over or under the discount and origination fee authorized by the Secondary Marketing Department [of Wells] at the time the final price on the loan is locked in." (middle of Bates Nos. WFHM1637; 1533).[37]

---

[34] For example, Todd Hauer, who was Wells' 30(b)(6) deponent on Urso's commissions, testified that loan profitability was communicated daily, and sometimes more frequently, to HMCs by "price blast sheets." (Ex. B, Hauer Depo. 71:10-75:9).

[35] Wells has redacted the actual basis points and numerous dollar figures from the produced copies of its plans claiming that these five year old plans still contain corporate trade secrets.

[36] As seen Bates Nos. WFHM1637 and 1534, the basis points vary based upon an ascending tier which factors in variously the number of loans (units) and dollar volume. What also enters into the tiers is whether the loan is one for purchase or refinance. Other loans may or may not be included, such as construction loans, referrals to program specialists, home equity loans, and SmartPay lines of credit.

[37] The plan then notes "employer reserves the right to reduce the commission rates on refi loans at any time on a prospective basis." The plan then goes on to introduce further variables with respect to (footnote continued)

24

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:06-md-1770 MHP

1    The <u>rate</u> of commission also varied based upon any overage or underage on the loan.
2    Overage is defined under the plan as "the amount of discount and origination fee paid at funding
3    over the discount and origination fee authorized by [Wells'] Secondary Marketing Department at
4    the time the final price on the loan is locked in." The amount of commission rate change for
5    overage is also tiered as shown by the chart on Bates Nos. WFHM1642 and 1538 at (C)(1). The
6    HMC must document the overage and receive approval from the Regional Sales Manager. To
7    receive commission credit, the employee "must collect a return to float fee from the borrower of
8    1% of the loan amount." Underage is defined as "any deficit resulting from the difference
9    between the company authorized discount and origination fee and the discount and origination fee
10   actually created... Employee's commission credit may be reduced up to 100% of underage as
11   determined by the Branch Sales Manager and Regional Sales Manager in accordance with Loan
12   Economics thresholds and standards... If employee's Loan Economics performance does not meet
13   the threshold level, then employee's commission credit may be reduced by a percentage of the
14   underage." (WFHM1642; 1538, C(2)). No explanation of "Loan Economics performance" is
15   given. "Threshold levels" are not explained. Hauer, Wells' 30(b)(6) deponent, testified that while
16   projected profitability was set by Wells in terms of par, overage and underage (see fn 34), HMC
17   branch managers also set their own thresholds of loan profitability. Different types of loans could
18   also have different thresholds set. (Ex. B, Hauer Depo. 101:7-103:18).

18   \\\

19

20   to refinances within six months, brokered loans, employee loans, home equity loans connected
21   with refis, Assistant/Associate underage sharing, national subsidies, and Prefer to Refer loans.
     (bottom of Bates Nos. WFHM1637; 1533-1534). Different basis points are involved if there is a
22   government loan (FHA/VA), a subprime loan, a special housing bond loan, a loan where Wells
     does not receive the servicing on the loan, an equity loan, a line of credit, an employee loan, a
23   portfolio loan, a Premiere Asset referred loan, an assumption or bridge loan, and a loan referred by
24   other Wells employees or bankers. (¶¶9-13, 15-17, 19 (Bates Nos. WFHM1639-1641; 1536-
     1538)). Paragraph 14 of the plan, which appears at Bates Nos. WFHM1641 and 1537, deals with
25   builder loans. It provides that the commission rate for builder loans derived from an account
     established solely by the HMC shall be in accordance with the standard commission schedule "as
26   set forth above," but that the rate may be reduced if the account was "derived" from a relationship
     with a Regional Builder Sales Manager, a Regional Builder, National Markets Builder, or New
27   Construction Sales Manager.

28
                                        25

1  The actual commission "credit" could also be reduced if a pricing subsidy established by
2  Wells was used in connection with the loan. The partial or full reduction of the commission credit
3  is made on a loan-by-loan basis "as communicated by management." (WFHM1644; 1540, ¶H).
4  All of the general provisions of the plan are then subject to individualization for each individual
5  HMC as indicated in Attachment A to the plan and Attachment B (the Commission Rate
6  Adjustment Schedule). Wells has informed Plaintiff's Counsel that no completed Attachments A
7  and B (which require the signatures of two levels of managers) can be located with respect to
8  Urso. While the Wells plan is confusing, the one thing that is very clear is that the commission is
9  not based on the price of the product.

**B. Illegal Deductions Void The Commission Plans And Disqualify The Commissions**

10  Wells' commission plans are also fatally flawed because it allowed for, and Urso actually
11  suffered, deductions from wages. These deductions not only render Wells' commissions
12  unqualified because they were not based simply on a percentage of the product's price, these
13  deductions were illegal and in clear contravention of long standing California law, Wage Orders,
14  and case law. Because these illegal deductions were key elements of Wells' overall commission
15  plan, these deductions voided that plan and vitiated any right by Wells to claim that monies paid to
16  Urso represented qualified commissions. In *Kerr's Catering Service v. Department of Industrial*
17  *Relations*, (1962) 57 Cal.2d 319, 329, the California Supreme Court held that an employer's
18  deductions from a saleswoman's commission for cash shortages was illegal. The employer argued
19  that prohibiting deductions for such shortages placed the burden of loss on the employer. The
20  Supreme Court responded "...some cash shortages, breakage and loss of equipment are inevitable
21  in almost any business operation. It does not seem unjust to require the employer to bear such
22  losses as expenses of management..." Noting that deductions violated the employee bond law
23  provisions of the Labor Code (§§400-410), the Supreme Court stated that this voided the contract:
24  "The imposition by statute of a penalty implies a prohibition of the act referred to and a contract
25  founded upon such act is void." [citations omitted] (*Id.* at p. 328).

26  Seventeen years later, the case of *Quillian v. Lion Oil Company*, (1979) 96 Cal.App.3d
27  156, 162-163 involved a manager of two service stations whose wages consisted of a base salary
     plus an incentive bonus based upon sales less shortages. The court found this payment plan to be
28

26

1   a subterfuge and illegal: "Rather than call this incentive payment a commission and then deduct

2   for shortages in contravention to *Kerr*, appellant deducts shortages from the payment and calls the

3   final result a bonus. Appellant then self-righteously proclaims that no deductions were made from

4   the bonus. Unfortunately, the result is the same. The manager carries the burden of losses from

5   the station." The holding of these cases was followed in *Hudgins v. Neiman Marcus Group, Inc.*,

6   (1995) 34 Cal.App.4th 1109, 1123-24. In that case, the salesperson's commissions were reduced

7   by a proportion of merchandise returned by customers where the salesperson could not be

8   specifically identified. In finding that an employer may not reduce wages for costs arising from

9   other than the intentional misconduct or gross negligence of the employee, the court found "At

10  bottom, the Neiman Marcus deduction offends the Labor Code in precisely the same way the

11  bonus plan in *Quillian* did." After noting that Neiman Marcus had many options to curb the

12  impact of such unidentifiable returns, the court observed "the one tool that is *not* available to

13  Neiman Marcus, however, is an employment agreement by which Neiman Marcus requires its

14  employees to consent to unlawful deductions from their wages. (citations omitted)" Finally, in

15  *Prachasaisoradej v. Ralph's Grocery Company, Inc.*, (2007) 42 Cal.4th 217, 235-42, the Supreme

16  Court reviewed these earlier cases and distinguished them from a profit sharing plan. The court

17  noted, "In each of those cases, the employee's compensation, whether regular or supplementary,

18  was set, in essence, as a sales commission, i.e., as specified in promised share of the revenues

19  attributable to that employee's personal sales or managerial efforts. The set commission was then

20  directly reduced by the full dollar value of the merchandise and cash losses, as determined by the

21  employer, and regardless of employee fault... By this means, the employer reduced individual

22  employee's wages to increase its own retained profits. This is the practice the statutes,

23  regulations, and cases have prohibited." *Id.* at p. 236. In summary, the court found referencing the

24  Labor Code "...Sections 221 through 224, in combination with other statutes, establish a public

25  policy against *any* deductions, setoffs, or recoupments by an employer from employee wages or

26  earnings, except those deductions specifically authorized by statute. (citations omitted)" *Id.* at p.

27  241.

1    Wells' Compensation Plans included provisions that created varied deductions and none

2    required any finding of intentional misconduct or culpable negligence on Urso's part.[38]  These

3    deductions, called "deficits," included any fees uncollected from borrowers, "failure to meet loan

4    compliance and quality requirements, price protection, registration and documentation

5    requirements, or other performance requirements... Deficits may be subtracted from commission

6    credit one hundred percent..." (WFHM1636, Section IV(A)).[39]  Other deductions could be taken

7    by Wells to supplement the income of a mortgage assistant (WFHM1641; 1538, ¶18), underage

8    (WFHM1642; 1538, ¶C(2)), loan files incomplete or not compliant with the HMC Compliance

9    Assessment Job Aid (WFHM1644, ¶I), and "excessive loan fallout penalties" (WFHM1644,

10   V(C)).  In clear contravention of California law as articulated in *Barnhill v. Robert Saunders &*

11   *Co.*, (1981) 125 Cal.App.3d 1, 6-7, Wells also provided that these deductions were subject 100%

     to setoff from the HMC's final wages. (WFHM1644, Section V(C)).

12       A review of Urso's commission statements (Ex. T) and the deposition of Todd Hauer,

13   Wells' 30(b)(6) deponent on her commissions, establishes she did actually suffer such deductions.

14   For example, she had wages reduced for the assistance of a mortgage associate (Ex. B, Hauer

15   Depo. 99:17-24), for fees not collected (Hauer Depo. 109:17-24; 110:10-111:2), and for underage

16   (Hauer Depo. 112:15-113:3).

17   **C.  Wells Cannot Meet Other Requirements**

18       Finally, Urso asserts that Wells cannot affirmatively prove that it met several other critical

19   requirements of the commissioned sales exemption.  For example, without the detailed time

20   records mandated by 8 C.C.R. §11040(7)(A)(3) and (5) and with no real evidence of her work

21   schedule, it cannot prove that, in any given time period, Urso received one and one half times the

22   minimum wage. *Harris v. Investors, supra*, at 39.  Nor can Wells prove that in some months more

23   than half her compensation even came from commissions, let alone commissions that comported

24

25   [38] The applicable Wage Order forbids any employer to make any deduction from wages for losses
     "unless it can be shown that the shortage, breakage or loss is caused by a dishonest or willful act,

26   or by the gross negligence of the employee." (8 C.C.R. §11040(8)).

27   [39] Fees included were for appraisals, credit reports, lock, commitment, Builder Best, return to
     float, and other application fees. (WFHM1643 ¶G; 1540 ¶F).

28

1   with California law.  Nor were commissions paid on a regularly scheduled day.  Wells simply

2   failed to observe the straightforward requirements for California commissioned sales.

3

4   Dated: September 20, 2010                           Respecfully submitted,

5                                                       MCINERNEY & JONES

6
                                                         /s/ Kelly McInerney
7                                                       Kelly McInerney

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 | **PROOF OF SERVICE**
*In re Wells Fargo Home Mortgage Overtime Litigation*
2 | *Caroline Urso v. Wells Fargo Home Mortgage*
**United States District Court, Northern District of California**
3 | **Case No. 3:06-md-1770 MHP**

4 | I, the undersigned, declare as follows:

5 | I am employed in the County of Washoe, State of Nevada.

6 | I am over the age of eighteen (18) years and not a party to the within action; my business address is 18124 Wedge Parkway, #503, Reno Nevada, 89511.

7 |

8 | On September 20, 2010, I served the foregoing document(s) described as:

9 |     1.     PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ON WELLS' EXEMPTION CLAIMS UNDER THE: 1) FEDERAL AND CALIFORNIA OUTSIDE SALES EXEMPTIONS; 2)
10 |     FEDERAL AND CALIFORNIA ADMINISTRATIVE EXEMPTIONS; AND 3) CALIFORNIA COMMISSIONED SALES EXEMPTION
11 |     2.     DECLARATION OF KELLY McINERNEY IN SUPPORT OF PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY
12 |     JUDGMENT ON WELLS' EXEMPTION CLAIMS UNDER THE: 1) FEDERAL AND CALIFORNIA OUTSIDE SALES EXEMPTIONS; 2)
13 |     FEDERAL AND CALIFORNIA ADMINISTRATIVE EXEMPTIONS; AND 3) CALIFORNIA COMMISSIONED SALES EXEMPTION
14 |     3.     PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON WELLS' EXEMPTION CLAIMS UNDER
15 |     THE: 1) FEDERAL AND CALIFORNIA OUTSIDE SALES EXEMPTIONS; 2) FEDERAL AND CALIFORNIA ADMINISTRATIVE EXEMPTIONS; AND
16 |     3) CALIFORNIA COMMISSIONED SALES EXEMPTION

17 | on all interested parties in this action addressed to the addressee as follows:

18 | Lindbergh Porter, Jr., Esq.                 James F. Clapp, Esq.
lporter@littler.com                      jclapp@sdlaw.com
19 | Richard H. Rahm, Esq.                 Marita Murphy Lauinger, Esq.
rrahm@littler.com                     mlauinger@sdlaw.com
20 | Alison S. Hightower, Esq.              Zachariah P. Dostart, Esq.
ahightower@littler.com                zdostart@sdlaw.com
21 | LITTLER MENDELSON, PC          DOSTART CLAPP GORDON & COVENEY, LLP
650 California St., 22nd Floor        4370 La Jolla Village Drive, Suite 970
22 | San Francisco, CA 94108            San Diego, CA 92122
Telephone:   (415) 433-1940        Telephone:   (858) 623-4200
23 | Facsimile:    (415) 399-8490         Facsimile:    (858) 623-4299

24 | XX  By CM/ECF. I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the above
25 | CM/ECF registrant(s).

26 |       I declare under penalty of perjury under the laws of the United States of America that the above is true and correct. Executed on September 20, 2010 at Reno, Nevada.

27 |

28 |                                    Jennifer Smith

**PROOF OF SERVICE**